*Tapestry, Inc. v. Factory Mutual Insurance Company*, Misc. No. 1, September Term, 2022.

**POLICY INTERPRETATION – ALL-RISK PROPERTY INSURANCE – RISKS OR LOSSES COVERED**

The United States District Court for the District of Maryland certified a question to the Supreme Court of Maryland.*  The Court reformulated the question as follows:

> When a first-party, all-risk property insurance policy covers "all risks of physical loss or damage" to insured property from any cause unless excluded, is coverage triggered when a toxic, noxious, or hazardous substance—such as Coronavirus or COVID-19—is physically present in the indoor air of that property; is also present on, adheres to, and can later be dislodged from physical items on the property; and causes a loss, either in whole or in part, of the functional use of the property?

The Court answered the certified question:  No, provided the substance causes neither tangible, concrete, and material harm to the property nor deprivation of possession of the property.

*At the time of the certification, the Supreme Court of Maryland was named the Court of Appeals of Maryland.  At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland.  The name change took effect on December 14, 2022.

IN THE SUPREME COURT

OF MARYLAND*

Misc. No. 1

September Term, 2022

_____

TAPESTRY, INC.

v.

FACTORY MUTUAL INSURANCE
COMPANY

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Opinion by Fader, C.J.

_____

Filed: December 15, 2022

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland.  The name change took effect on December 14, 2022.

A question certified to us by the United States District Court for the District of Maryland (the "United States District Court") requires that we explore whether an insurance policy that "covers property . . . against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded," and further covers "TIME ELEMENT" losses "directly resulting from physical loss or damage of the type insured," is triggered by (1) the presence of Coronavirus in the air and on surfaces on the premises of the insured's retail stores or (2) the resulting loss of functional use of those stores during portions of the COVID-19 pandemic.[1] Assuming the truth of the facts pled in the operative complaint about how Coronavirus operates and how it impacted the insured's properties and operations, as summarized in the United States District Court's certification order, and based on the provisions of the insurance policies at issue, we will conclude that such allegations do not trigger the primary coverage provided by the policies.

There is nothing this Court can say to describe the gravity of the losses inflicted on the world by the COVID-19 pandemic that has not previously been said. We will not try. It is sufficient for these purposes to note that in addition to the countless other consequences of, and hardships imposed by, the pandemic, many businesses sustained substantial financial losses when they were compelled to close temporarily or alter their operations due to the pandemic and associated governmental orders.

---

[1] "Coronaviruses are a type of virus." *See What is Coronavirus?*, Johns Hopkins Med. (July 29, 2022), *archived at* https://perma.cc/NG7A-GM2L. SARS-CoV-2 is a coronavirus that causes the respiratory disease known as COVID-19. *Id.* In this opinion, for ease of reference, we use "Coronavirus" to refer to SARS-CoV-2 and COVID-19 to refer to the resulting disease.

One such business is that of Tapestry, Inc., the appellant. Factory Mutual Insurance Company ("FM"), the appellee, issued two first-person, all-risk commercial property insurance policies to Tapestry covering policy periods in which Tapestry's stores were closed in connection with the COVID-19 pandemic. The primary coverages provided under those policies are triggered by "physical loss or damage" to covered property.

Tapestry submitted claims to FM under the policies for losses exceeding $700 million. After FM denied coverage for the bulk of Tapestry's claim, Tapestry sued. In the lawsuit, which is now pending in the United States District Court, Tapestry contends that coverage under the policies is triggered because it suffered "physical loss or damage" both by the presence of Coronavirus in its stores and when those stores had to close for business due to the presence of Coronavirus. In response, FM contends that "physical loss or damage" requires structural alteration or permanent dispossession of property, and that Tapestry suffered neither. Because resolution of that dispute depends on an interpretation of Maryland law we have not previously provided, the United States District Court certified to this Court a question of law, which we have reformulated as follows:[2]

---

[2] The question as originally drafted by Tapestry and certified to this Court is:

> When a first-party, all-risk property insurance policy covers "all risks of physical loss or damage" to insured property from any cause unless excluded, is coverage triggered when a toxic, noxious, or hazardous substance—such as Coronavirus or COVID-19—that is physically present in the indoor air of that property damages the property or causes loss, either in whole or in part, of the functional use of the property?

Certification Order Certifying a Question of Law to the Maryland Court of Appeals ("Certification Order") at 1. As phrased, the question seems to presuppose that Coronavirus "damages the property." However, as reflected in the parties' briefing and as confirmed by their counsel at oral argument, the intent of the parties—and, they and we

2

When a first-party, all-risk property insurance policy covers "all risks of physical loss or damage" to insured property from any cause unless excluded, is coverage triggered when a toxic, noxious, or hazardous substance—such as Coronavirus or COVID-19—is physically present in the indoor air of that property; is also present on, adheres to, and can later be dislodged from physical items on the property; and causes a loss, either in whole or in part, of the functional use of the property?

As we will explain, as applied to the policies at issue, our answer to the certified question is: No, provided the substance causes neither tangible, concrete, and material harm to the property nor deprivation of possession of the property.

## BACKGROUND

Pursuant to § 12-605(a) of the Courts and Judicial Proceedings Article (2020 Repl.), the United States District Court's Certification Order contains "[t]he facts relevant to the question, showing fully the nature of the controversy out of which the question arose." *Id.* § 12-606(a). In responding to the certified question, "this Court accepts the facts provided by the certifying court." *United Bank v. Buckingham*, 472 Md. 407, 411 (2021). The following recitation of facts is drawn from the Certification Order and the three documents attached to and incorporated into it: Tapestry's operative first amended complaint (the "Complaint") and the two insurance policies at issue.

believe, the United States District Court—is not to presuppose that Coronavirus has caused "physical loss or damage" as that phrase is used in the FM policies. Instead, the intent is to have this Court address whether, under Maryland law, the allegations in Tapestry's first amended complaint concerning the operation and effect of Coronavirus on its stores and business constitute "physical loss or damage" such as to trigger coverage under FM's policies. Our reformulation of the certified question is designed to reflect that.

3

*The Parties and the Policies*

Tapestry owns "modern luxury accessory and lifestyle brands" including Coach, kate spade new york, and Stuart Weitzman. Tapestry operates "over 1,400 stores in the U.S. and internationally, including 15 stores in Maryland."

FM drafted and issued to Tapestry two "all-risk" commercial property insurance policies: (1) Policy No. 1050294, covering policy period April 4, 2019 through April 3, 2020; and (2) Policy No. 1065667, covering policy period April 4, 2020 through April 3, 2021 (collectively, the "Policies").[3] The Policies, which FM wrote using its FM Global Advantage Time Element Select form, "cover[] property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded." The critical phrase "physical loss or damage" is not defined in the Policies.

As relevant here, the Policies provide two broad categories of coverage: "Property Damage" and "Time Element."[4] Each category is set forth in a separate section of each Policy that contains, among other things, a broad coverage grant, various exclusions, and various additional coverages. Each Policy provides a maximum overall limit of liability per occurrence of $1 billion, applicable to all coverages, with lower sublimits applicable to specified types of coverage.

---

[3] Each policy technically expires at 12:01 a.m. on April 4 of the year of expiration.

[4] The Policies also provide a third category of coverage—"Loss Adjustment and Settlement"—which is not relevant to the present dispute.

4

***Property Damage Coverage Provisions***

The Policies' primary Property Damage coverage extends to all of Tapestry's real property and certain personal property, subject to exclusions. Two of those exclusions are relevant to our analysis. First, each Policy excludes coverage, "unless otherwise stated," for, among other things, "interruption of business, except to the extent provided by this Policy" and "loss of market or loss of use." Second, each Policy excludes, "unless directly resulting from other physical damage not excluded by this Policy . . . **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy."[5] As relevant here, the Policies define "**contamination**" as "any condition of property due to the actual or suspected presence of any foreign substance, impurity, . . . toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent[.]"

One category of "Additional Coverage" provided in each Policy's Property Damage section is "Communicable Disease Response" coverage. Under that coverage grant, "[i]f a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease**" that results in a restriction on access to the location, the Policies will "cover[] the reasonable and necessary costs incurred by the Insured at such **location**[.]" The Policies define "**communicable disease**" as "disease which is [ ] transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges."

---

[5] Words identified in boldface type in the Policies are defined in each Policy.

### *Time Element Coverage Provisions*

In each Policy, the primary coverage grant for Time Element losses[6] provides that the "Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured."[7] The Policies insure such losses only to the extent they are incurred "during the Periods of Liability," which, for purposes of physical loss or damage to "building[s] and equipment,"[8] is the period:

a) starting from the time of physical loss or damage of the type insured; and

b) ending when with due diligence and dispatch the building and equipment could be:

(i) repaired or replaced; and

(ii) made ready for operations,

---

[6] In other policies, time element coverage is sometimes referred to as business interruption or business income loss coverage. *See, e.g.*, *Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 932 (4th Cir. 2022) (addressing policy providing "[b]usiness income loss coverage"); *Cordish Cos., Inc. v. Affiliated FM Ins. Co.*, 573 F. Supp. 3d 977, 987 (D. Md. 2021) (interpreting policy covering "[b]usiness [i]nterruption loss"), *aff'd*, No. 21-2055, 2022 WL 1114373 (4th Cir. Apr. 14, 2022).

[7] Each Policy's "TIME ELEMENT COVERAGES" provide coverage for (1) at the insured's option, either gross earnings and extended period of liability or gross profit; (2) extra expense; (3) leasehold interest; and (4) rental insurance.

[8] The Policies define the period of liability differently when the physical loss or damage at issue is to other types of property, including "building and equipment under construction," "stock-in-process and mercantile stock," "raw materials and supplies," "water," "physically damaged exposed films, records, manuscripts and drawings," and "physically damaged or destroyed property covered under DATA, PROGRAMS OR SOFTWARE." Here, because Tapestry's claim relates at least primarily to alleged loss and damage to buildings and equipment—and because the other categories are either clearly inapplicable or also define their ending point by reference to the repair or replacement of the property at issue—we focus on that definition.

6

under the same or equivalent physical and operating conditions that existed prior to the damage.

The Time Element coverage section of the Policies includes several "TIME ELEMENT COVERAGE EXTENSIONS" and "ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS." One extension in the latter category is the Interruption by Communicable Disease additional coverage extension, which provides that if "a **location** owned, leased or rented by [Tapestry] has the actual not suspected presence of **communicable disease**" that results in a restriction on access to the property, the Policies will cover "Actual Loss Sustained and EXTRA EXPENSE incurred by [Tapestry] during the PERIOD OF LIABILITY at such **location**[.]" The Policies exclude from the Interruption by Communicable Disease coverage extension "loss resulting from" (1) enforcement of a law or ordinance in place before the spread of the communicable disease; and (2) "loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event[.]" Notably, unlike the primary Time Element coverage, the Interruption by Communicable Disease additional coverage extension is not predicated on the insured property sustaining "physical loss or damage."

Under each Policy, Interruption by Communicable Disease coverage and Communicable Disease Response coverage are together subject to an aggregate sublimit of liability of $1 million per occurrence (as opposed to the Policy limit of $1 billion per occurrence).

7

*Coronavirus on Tapestry's Property*

The Certification Order contains the following summary of the allegations contained in the Complaint concerning how Coronavirus operates and how it affected Tapestry's properties and operations:

> With the support of dozens of peer-reviewed studies, Tapestry alleges in its [Complaint] that Coronavirus/COVID-19 are serious threats rendering objects, surfaces, and areas exposed to them dangerous and fatal. *See* Ex. A ¶¶ 26, 30, 162. Coronavirus spreads through indoor spaces via respiratory particles expelled by infected individuals (including those who are asymptomatic or pre-symptomatic). *Id.* ¶¶ 26-28, 32-33. The presence of Coronavirus in the air, through aerosols or droplets, is the virus' primary transmission vector. *Id.* ¶¶ 40-41, 43-44. Coronavirus, just like ammonia, physically transforms the content of the air and can remain airborne in respiratory particles for indefinite periods. *Id.* ¶¶ 33, 35-36, 44. Ventilation systems are particularly significant transmission vectors as studies have found Coronavirus in ceiling vent openings, vent exhaust filters, and ventilation ducts up to 180 feet from an infected individual. *Id.* ¶¶ 40, 42. As a result, Tapestry alleges that Coronavirus causes the same physical loss or damage to property as that of ammonia, smoke, soot, radon gas, asbestos and other hazardous substances. *Id.* ¶ 35.
>
> Coronavirus particles can also settle on surfaces that themselves become carriers for the disease ("fomites"). *Id.* ¶¶ 32, 49, 51, 53, 56. These fomites remain infectious for days after exposure and do not readily dissipate. *Id.* ¶¶ 31, 51-52, 54-55. Tapestry's various stores contain materials—like plastics, glass, metals, and fabrics—that have been documented as Coronavirus fomites. *Id.* ¶¶ 52 n.57, 59. Even disturbing a fomite—like shaking a contaminated textile such as clothing merchandise—can spread Coronavirus particles and create additional fomites. *Id.* ¶¶ 52, 59. Indeed, studies have demonstrated that "it is biologically plausible that . . . infectious disease [such as COVID-l9] can be transmitted directly through contact with [Coronavirus] contaminated textiles." *Id.* ¶ 69.
>
> Removing Coronavirus from air is not possible as a practical matter, and no amount of cleaning will prevent reintroduction of the virus when an infected person enters the space—only shutting down the property prevents the repeated and continuous reintroduction of Coronavirus. *Id.* ¶¶ 63, 76, 78. Coronavirus cannot be removed from indoor air by surface cleaning, which actually causes virus particles to become airborne. *Id.* ¶¶ 70, 74-75.

8

Attempting to remove Coronavirus from surfaces requires unique protocols such as the use of "harsh chemicals" that are not routinely used and which themselves are alleged to have caused additional physical loss or damage to Tapestry's stores. *Id.* ¶¶ 65-68, 71. Indeed, "Coronavirus is 'much more resilient to cleaning than other respiratory viruses so tested.'" *Id.* ¶ 64. Moreover, it is "challenging to accurately determine the efficacy of decontaminating agents and . . . if surface disinfection [is] even effective" given the toxicity of the agents and the microscopic nature of Coronavirus particles. *Id.* ¶ 66.

Nonetheless, Tapestry asserts that it repaired and remediated its physical space, such as through the removal and disposal of porous materials like clothing, reconfiguring and altering interior spaces of property, and installing physical barriers to create physical distancing. *Id.* ¶¶ 71-72, 150, 155[,] 227. Tapestry suffered massive losses, in the hundreds of millions of dollars, for extensive and costly health and safety protocols and modifications to its stores. *Id.* ¶¶ 152, 155, 227.

. . .

Tapestry alleges that individuals infected with Coronavirus and COVID-19 were present on its insured properties where they spread the virus. *Id.* ¶¶ 79-80. . . . This supports the allegation that Coronavirus/COVID-19 was present at Tapestry's stores. *Id.* ¶¶ 80, 99.

Furthermore, Tapestry alleges that a detailed biostatistical analysis demonstrates that it is statistically certain that customers and other individuals who visited its stores contracted and carried Coronavirus before the stores were closed, and during the time when various stores' operations were severely restricted. *Id.* ¶¶ 83-91, 94, 96-101.

Due to the presence of Coronavirus/COVID-19 and the effects it had on Tapestry's stores (particularly the indoor air), Tapestry closed all of its North American stores beginning on March 18, 2020—prior to the issuance of government orders in many counties where Tapestry operates. *Id.* ¶¶ 56-60, 78, 119, 122, 127-128, 132, 137-38, 142.

***This Litigation***

In responses to notices of claims Tapestry provided under both Policies, FM denied coverage under all coverages except the Communicable Disease Response and Interruption by Communicable Disease coverages, neither of which is predicated on "physical loss or

damage" to property. In its denial letters, FM contended that Tapestry could not meet the requirement of other coverages because "the presence of COVID-19 does not cause physical loss or damage." FM also asserted that coverage was barred by the Contamination Exclusion in the Policies.

Tapestry then initiated this lawsuit in the Circuit Court for Baltimore County. FM removed it to the United States District Court. Tapestry's Complaint contains two counts. In Count I, Tapestry seeks a declaratory judgment concerning the respective rights and obligations of the parties under the Policies. Specifically, Tapestry seeks declarations "that the Policies cover the losses it had suffered" and "that FM is responsible for fully and timely paying the Tapestry Claim." In Count II, Tapestry seeks an award of damages and other relief for FM's alleged breaches of contract in denying coverage under the Policies under all coverages other than the Communicable Disease Response and Interruption by Communicable Disease coverages, which are subject to much lower sublimits of liability than the primary coverages.

FM moved to dismiss the Complaint. With its opposition to that motion, Tapestry filed a motion to certify a question of law to this Court. The United States District Court granted the motion and issued the Certification Order.

## DISCUSSION

Under the Maryland Uniform Certification of Laws Act, Courts and Judicial Proceedings §§ 12-601 – 12-612, this Court "may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional

10

provision, or statute of this State." Md. Code Ann., Cts. & Jud. Proc. § 12-603; *see also* Md. Rule 8-305. "In responding to a certification from another court, this Court resolves only issues of Maryland law, not questions of fact." *Murphy v. Liberty Mut. Ins. Co.*, 478 Md. 333, 367 (2022) . This Court "may go no further than the question certified." *Price v. Murdy*, 462 Md. 145, 147 (2018) (quoting *AGV Sports Grp., Inc. v. Protus IP Sols., Inc.*, 417 Md. 386, 389 n.1 (2010)).

The question certified by the United States District Court, as we have reformulated it pursuant to § 12-604, *see* discussion above at footnote 2, is:

> When a first-party, all-risk property insurance policy covers "all risks of physical loss or damage" to insured property from any cause unless excluded, is coverage triggered when a toxic, noxious, or hazardous substance—such as Coronavirus or COVID-19—is physically present in the indoor air of that property; is also present on, adheres to, and can later be dislodged from physical items on the property; and causes a loss, either in whole or in part, of the functional use of the property?

Notably, the certified question does not concern either (1) the possibility of coverage under the Communicable Disease Response or Interruption by Communicable Disease coverages of the Policies, or (2) the possible application of the Policies' Contamination Exclusion. As a result, we will not decide those issues. We will, however, discuss those provisions of the Policies to the extent they aid in our interpretation of the key policy term "physical loss or damage."

### THE PHRASE "PHYSICAL LOSS OR DAMAGE" IN THE POLICIES REQUIRES EITHER TANGIBLE, CONCRETE, AND MATERIAL HARM TO THE INSURED PROPERTY OR DEPRIVATION OF POSSESSION OF THE INSURED PROPERTY.

Answering the certified question requires us to construe the language of insurance policies, which we do "according to contract principles," *Md. Cas. Co. v. Blackstone Int'l*

11

*Ltd.*, 442 Md. 685, 694 (2015), "under the objective theory of contract interpretation," *Plank v. Cherneski*, 469 Md. 548, 617 (2020). Under that approach, unless the language of the contract is ambiguous, we interpret it "based on what a reasonable person in the position of the parties would have understood the language to mean and not 'the subjective intent of the parties at the time of formation.'" *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 393 (2019) (quoting *Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 86 (2010)); *see also JMP Assocs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 345 Md. 630, 635 (1997) ("The test is what meaning a reasonably prudent layperson would attach to the term." (quoting *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 521-22 (1997))). "Thus, 'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract.'" *Md. Cas. Co.*, 442 Md. at 695 (quoting *Long v. State*, 371 Md. 72, 84 (2002)).

"[A] court interpreting an insurance policy is to examine the instrument as a whole, focusing on the character, purpose, and circumstances surrounding the execution of the contract." *Bailer*, 344 Md. at 521; *see also Plank*, 469 Md. at 617 ("In interpreting a contract provision, we look to the entire language of the agreement, not merely a portion thereof." (quoting *Nova Rsch., Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 448 (2008))). If language in an insurance policy is ambiguous when interpreted according to the principles of contract interpretation set forth above, "we construe that language 'liberally in favor of the insured and against the insurer *as drafter of the instrument*.'" *Connors v. Gov't Emps. Ins. Co.*, 442 Md. 466, 483 (2015) (quoting *Megonnell v. United Servs. Auto. Ass'n*, 368 Md. 633, 655 (2002)). A contract "is ambiguous if, 'when viewed

12

from [a] reasonable person perspective, that language is susceptible to more than one meaning.'" *Plank*, 469 Md. at 617 (quoting *Ocean Petroleum*, 416 Md. at 87). However, merely because "a term cannot be precisely defined so as to make clear its application in all varying factual situations does not mean that it is ambiguous." *Allstate Ins. Co. v. Humphrey*, 246 Md. 492, 496 (1967).

We begin our analysis by focusing on the ordinary meaning of the terms contained in the key phrase on which the answer to the certified question hinges: "physical loss or damage." We will then expand our focus to the interpretation of that phrase in the broader context of the Policies as a whole. From those sources, we will derive and apply an interpretation of "physical loss or damage" to the allegations of the Complaint. Finally, we will turn to a review of caselaw from courts interpreting Maryland law and around the country, which we will conclude is overwhelmingly consistent with our own interpretation of "physical loss or damage" and our answer to the certified question.

### A.    Ordinary Meaning

"Traditionally, to supply contractual language with its 'ordinary and accepted meanings[,]' this Court consults the dictionary definition of such terms." *Credible Behav. Health*, 466 Md. at 394-95 (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985)). The Court looks to dictionary definitions "to identify the common and popular understanding of the words used in the contract as evidence of what a reasonable person in the position of the parties would have understood those terms to mean." *W.F. Gebhardt & Co. v. Am. Eur. Ins. Co.*, 250 Md. App. 652, 668 (2021). While dictionaries are useful tools, "simply because [a party] can point to several slightly different

13

dictionary definitions of [a word] does not render that term ambiguous." *Rigby v. Allstate Indem.*, 225 Md. App. 98, 110 (2015).

We begin with the modifier "physical," which the *New Oxford American Dictionary* defines, as relevant here, as "of or relating to things perceived through the senses as opposed to the mind; tangible or concrete." *Physical*, *New Oxford American Dictionary* 1321 (3d ed. 2010); *see also* 11 *Oxford English Dictionary* 744 (2d ed. 1989) ("[o]f or pertaining to material nature"; and "pertaining to or connected with matter; material; opposed to *psychical, mental, spiritual*"). *Merriam-Webster* defines physical as "having material existence," "perceptible esp[ecially] through the senses and subject to the laws of nature," and "of or relating to material things." *Physical*, *Merriam-Webster's Collegiate Dictionary* 935 (11th ed. 2014). And *Black's Law Dictionary* similarly defines physical, as relevant here, as "[o]f, relating to, or involving material things; pertaining to real, tangible objects." *Physical*, *Black's Law Dictionary* 1386 (11th ed. 2019). Physical thus refers generally to tangible, concrete things that have a material existence and can be perceived by the senses.[9]

Loss, as relevant here, is defined by the *New Oxford American Dictionary* as "the fact or process of losing something or someone," *Loss*, *New Oxford American Dictionary* 1033 (3d ed. 2010), and by the *Oxford English Dictionary* as "[t]he being deprived of, or

---

[9] *Accord, e.g.*, *Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 932 (4th Cir. 2022) ("[T]he word 'physical' means 'relating to natural or material things[.]'"); *Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 455-56 (5th Cir. 2022) ("'[P]hysical' means 'of, relating to, or involving material things; pertaining to real, tangible objects.'" (quoting *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 24 (Tex. 2015) (in turn quoting *Black's Law Dictionary* 1331 (10th ed. 2014)))).

14

the failure to keep (a possession, appurtenance, right, quality, faculty, or the like)," *Loss*, 9 *Oxford English Dictionary* 37 (2d ed. 1989). *Merriam-Webster* defines loss in relevant part as "destruction, ruin," "the act of losing possession," and "a person or thing or an amount that is lost." *Loss*, *Merriam-Webster's Collegiate Dictionary* 736 (11th ed. 2014). And *Black's Law Dictionary* defines the term, again as relevant here, as "[t]he failure to maintain possession of a thing."[10] *Loss*, *Black's Law Dictionary* 1132 (11th ed. 2019). The *New Oxford American Dictionary* defines damage, as relevant here, as "physical harm caused to something in such a way as to impair its value, usefulness, or normal function." *Damage*, *New Oxford American Dictionary* 436 (3d ed. 2010); *see also* 4 *Oxford English Dictionary* 224 (2d ed. 1989) ("Injury, harm; *esp[ecially]* physical injury to a thing, such as impairs its value or usefulness."). Similarly, *Merriam-Webster* defines damage as "loss or harm resulting from injury to person, property, or reputation." *Damage*, *Merriam-Webster's Collegiate Dictionary* 314 (11th ed. 2014).[11] In this context, loss thus refers generally to being deprived of possession of something, whether by its disappearance or destruction; whereas damage refers to harm suffered.[12]

---

[10] *Black's Law Dictionary* and *Merriam-Webster's* each also contain definitions specific to insurance that, in this context, would be circular. *See Loss*, *Merriam-Webster's Collegiate Dictionary* 736 (11th ed. 2014) ("the amount of an insured's financial detriment by death or damage that the insurer is liable for"); *Loss*, *Black's Law Dictionary* 1132 (11th ed. 2019) ("[t]he amount of financial detriment caused by an insured person's death or an insured property's damage, for which the insurer becomes liable").

[11] *Black's Law Dictionary* defines "damage" related to the concept of monetary compensation for loss or injury, which is not applicable here. *Damage*, *Black's Law Dictionary* 488 (11th ed. 2019).

[12] *Accord, e.g.*, *Uncork & Create*, 27 F.4th at 932 ("[T]he word 'damage' in this context means an 'injury or harm . . . to property.'" (quoting *Webster's Third New Int'l*

15

From their dictionary definitions, we thus glean that "physical loss or damage" to covered property must involve tangible, concrete, and material harm to the property or a deprivation of possession of the property.[13]  That conclusion supports FM's position that "physical loss or damage" requires "tangible, physical changes to insured property."

Tapestry argues that the plain meaning of "physical loss or damage" also embraces, in addition to a loss of possession of property, "a functional loss of use of property due to the presence of an external force[.]"[14]  In doing so, however, Tapestry fails to engage with the common meanings of the relevant terms.  Instead, Tapestry merely states its preferred interpretation, claims that "[d]ictionary definitions of the relevant terms . . . demonstrate

---

*Dictionary* 571 (2002))); *Estes v. Cincinnati Ins. Co.*, 23 F.4th 695, 700 (6th Cir. 2022) ("[T]he word 'loss' means 'destruction' or 'deprivation' (that is, 'the act of losing possession')." (quoting *Merriam-Webster's Collegiate Dictionary* 736 (11th ed. 2014))); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 402 (6th Cir. 2021) (defining "loss" as "[p]erdition, ruin, destruction; the condition or fact of being 'lost,' destroyed, or ruined, or 'being deprived of'" (quoting *Oxford English Dictionary Online* (3d ed. 2021))); *Indiana Repertory Theatre v. Cincinnati Cas. Co.*, 180 N.E.3d 403, 408 (Ind. Ct. App. 2022) ("'Damage' is 'loss due to injury: injury or harm to person, property, or reputation: hurt, harm.'" (quoting *Webster's Third Int'l Dictionary* 571 (Unabridged ed. 1966))).

[13] *Accord, e.g.*, *Uncork & Create*, 27 F.4th at 932 ("Thus, with reference to a defined premises, the plain understanding of the terms 'physical loss' or 'physical damage' is material destruction or material harm."); *Estes*, 23 F.4th at 700 ("Putting these definitions together, a covered source itself must destroy covered property or deprive the property's owner of possession.").

[14] Tapestry emphasizes that the Policies' use of both "loss" and "damage" necessarily implies that they must have different meanings and, therefore, cannot both require physical damage to property.  As discussed, we agree that loss and damage, as used in the phrase "physical loss or damage," embrace different, although partially overlapping, concepts.  For example, a loss may be occasioned by the "destruction" or "ruin" of property, which also constitutes damage, but may also be occasioned by theft, removal, disappearance, or other acts that would not necessarily involve physical damage.  But we do not see how that advances Tapestry's claim that a "physical loss" extends to a temporary loss of functional use of property.

16

this," and then drops a footnote providing a single definition for each of the three terms. The definitions, all from the *Oxford English Dictionary* and none offering apparent support for Tapestry's proposed expansion to "functional loss of use," are unaccompanied by any analysis or further exposition.

Looking only to the ordinary meaning of the terms in isolation, we would be skeptical of Tapestry's unexplained contention that "physical loss" can embrace a "functional loss of use" for the simple reason that losing a thing is conceptually different than losing the functional use of that thing for a period of time. *Accord Santo's Italian Café*, 15 F.4th at 402 ("A loss of use simply is not the same as a physical loss."). Although the complete destruction or ruin of property can, indeed, constitute a loss of that property, by permanently depriving the owner of any value in it, the temporary loss of functional use of the same thing is different. *See, e.g.*, *Terry Black's Barbecue*, 22 F.4th at 456 (rejecting the contention that a loss of use of property could constitute "direct physical loss" because the relevant policy provision "unambiguously requires a *loss of property*, not the loss of *use* of property"). In other words, Tapestry's proposed addition of the words "functional" and "of use" to arrive at its preferred interpretation of "loss" transforms the concept and gives it a different meaning than that contained in the language of the Policies.

## B.    Context

Expanding our analysis to the context provided by other provisions of the Policies demonstrates the validity of our initial skepticism of Tapestry's proposed, expansive definition of "physical loss or damage." Several aspects of the Policies confirm our interpretation of that phrase as not encompassing a functional loss of use of the property.

17

First, the declarations pages of the Policies state that they cover "property . . . against ALL RISKS OF PHYSICAL LOSS OR DAMAGE" not excluded. In the context of property damage coverage, "physical loss or damage" thus "characterizes what effects the covered causes must have on the property to trigger coverage, not the causes themselves." *Verveine Corp. v. Strathmore Ins. Co.*, 184 N.E.3d 1266, 1273 (Mass. 2022) (addressing coverage triggered by "direct physical loss of or damage to Covered Property"). The Time Element coverage section then provides coverage for losses incurred by an insured business "directly resulting from physical loss or damage of the type insured." To be covered, therefore, Time Element loss must be the result of "physical loss or damage" that, in turn, results from a covered (i.e., in an "all risks" policy, not excluded) cause. If "functional loss of use" could itself constitute "physical loss or damage," as Tapestry contends, then the Time Element coverage would, in circular effect, provide coverage for losses suffered due to the inability to use property (losses suffered during the period of liability) resulting from the inability to use that property (the functional loss of use of the property). Tapestry's interpretation is at odds with the very structure of the Policies.[15] *See GPL Enter. LLC v. Certain Underwriters at Lloyd's*, 254 Md. App. 638, 659 (2022) (explaining that an insured failed to explain how a Governor's order prohibiting certain types of operations could

---

[15] As the Massachusetts Supreme Judicial Court explained in *Verveine Corp.*, the fact that policy language like "physical loss or damage" describes both the *effect* required to trigger property damage coverage and the *cause* of loss for purposes of time element coverage does not undermine the requirement that the insured's property first suffer the *effect* of "physical loss or damage" to trigger coverage under the policy in the first place. 184 N.E.3d at 1274; *see also Santo's Italian Café*, 15 F.4th at 402 (identifying "[t]he imperative of a 'direct physical loss' or 'direct physical damage'" as "the North Star of this property insurance policy from start to finish").

constitute both a "direct physical loss" under an all-risk property insurance policy and the interruption of business resulting from such a loss).

Second, under the Time Element coverage, the Period of Liability for damage to building and equipment extends from "the time of physical loss or damage of the type insured" to the time when "the building and equipment could be [] repaired or replaced; and [] made ready for operations." Those concepts make sense under our interpretation of "physical loss"—subject to remedy by replacement—and "physical . . . damage"—subject to remedy by repair or replacement.[16] They do not make sense under Tapestry's definition in that a temporary, functional loss of use of property, without more, is remedied by regaining functional use of the property, not by repair or replacement.[17] *Accord Terry Black's Barbecue*, 22 F.4th at 456 ("This period [of liability] necessarily contemplates a tangible alteration to the property that requires repair, rebuilding, or replacement."); *Cordish Cos.*, 573 F. Supp. 3d at 998-99 ("The idea that the property may be 'repaired or

---

[16] As stated in the Certification Order, "Tapestry asserts that it repaired and remediated its physical space, such as through the removal and disposal of porous materials like clothing, reconfiguring and altering interior spaces of property, and installing physical barriers to create physical distancing." However, the measures Tapestry describes are the disposal of merchandise and functional changes to the layout of its stores to increase social distancing, not the repair or remediation of damaged or lost property.

[17] The inconsistency of Tapestry's interpretation with the Period of Liability provision of the Policies is especially stark in connection with a communicable disease, such as COVID-19, in which a functional loss of use of property could potentially be wholly restored by the development of an effective vaccine or advent of so-called "herd immunity," *see* Leon Gordis, *Epidemiology* 26 (5th ed. 2014) (defining "herd immunity" as "the resistance of a group of people to an attack by a disease to which a large proportion of the members of the group are immune"), with no change of any kind to the property itself.

19

replaced' is consistent with the view that the damage contemplated by the Policy must be physical in nature.").

Third, the Policy contains an additional Time Element coverage extension for Interruption by Communicable Disease, which applies when the presence of a communicable disease results in a government-ordered *or* insured-directed restriction on access to an insured location. Notably, the Interruption by Communicable Disease coverage extension, unlike the primary Time Element coverage, does not require "physical loss or damage" to covered property and, therefore, is triggered by the restriction on access itself. The juxtaposition of that coverage extension, which specifically contemplates the operation and effects of a communicable disease like COVID-19 on business operations without requiring a trigger of "physical loss or damage," against the different requirements of the primary Time Element coverage grant, undermines Tapestry's claim to coverage under the latter.[18]

---

[18] Tapestry argues that the Interruption by Communicable Disease additional coverage extension supports its position, pointing to an exclusion contained within that extension stating that "This Policy does not insure loss resulting from . . . loss or damage caused by or resulting from terrorism[.]" Tapestry argues that that exclusion constitutes an acknowledgment that communicable diseases can cause loss or damage to property. That provision cannot bear the weight Tapestry gives it because, among other reasons: (1) the reference to "loss or damage" does not contain the modifier "physical"; (2) the exclusion may be a shorthand restatement of the broadly worded exclusion appearing earlier in the Policies of "loss or damage directly or indirectly caused by or resulting from . . . terrorism," not a separate exclusion tailored to that coverage extension; and (3) nothing about our analysis precludes the possibility that a communicable disease *could* cause "physical loss or damage" to property, depending on how the particular disease actually operates (or, for purposes of a motion to dismiss, is alleged to operate).

Tapestry makes one other argument tied to the existence of the related Communicable Disease Response and Interruption by Communicable Disease coverage extensions. Observing that the general Time Element coverage grant applies to "TIME

20

By contrast, we find no other provisions of the Policies that support Tapestry's interpretation of "physical loss or damage" as extending to a temporary, functional loss of use of the property.[19] Considering that phrase in the context of the Policies as a whole thus confirms our conclusion that that policy language is unambiguous and that a "reasonable person in the position of the parties," *Credible Behav. Health*, 466 Md. at 393, would understand "physical loss or damage" to property, as used in the Policies, to require tangible, concrete, and material harm to the property or a deprivation of possession of the property.

Tapestry further contends that we should take into consideration that at the time FM wrote the Policies, more than 80% of property insurance policies included a broad, ISO-drafted[20] virus exclusion that FM did not incorporate into its policies. FM responds that the Contamination Exclusion in the Policies performs the same work and that the

---

ELEMENT loss . . . directly resulting from the physical loss or damage *of the type insured*" (emphasis added), Tapestry argues that because the Policies cover some losses caused by communicable diseases, those diseases constitute a risk "of the type insured" that then must come within the scope of that general coverage grant. That argument, however, ignores: (1) the link to "physical loss or damage" that precedes "of the type insured"; and (2) the absence of a requirement of "physical loss or damage" as a prerequisite to the coverages relating to communicable disease.

[19] Even with respect to electronic data, the Policies require "physical loss or damage" in the form of "destruction, distortion or corruption of electronic data, programs or software" to trigger coverage, not mere loss of use.

[20] The Insurance Services Office ("ISO") is "the primary drafting organization for property insurers." Charles M. Miller, et al., *COVID-19 and Business-Income Insurance: The History of "Physical Loss" and What Insurers Intended It to Mean*, 57 Tort, Trial, & Ins. Prac. L.J. __ (forthcoming 2022), *archived at* https://perma.cc/PV4Q-KGVF.

absence of an exclusion does not create coverage.[21]  Ultimately, we are interpreting the

Policies FM issued.  We do not think the availability on the insurance market of a broader

virus exclusion undermines the unambiguous language employed in the Policies.[22]  *See,*

*e.g.*, *Verveine Corp.*, 184 N.E.3d at 1277-78 (rejecting insured's proposed "negative

implication" from the absence of an express virus exclusion in certain policies while it is

included in others).

## C.    Application

We understand Tapestry to make three different arguments for why the allegations

in the Complaint concerning its losses resulting from the presence of Coronavirus on its

property constitute "physical loss or damage" so as to trigger coverage under the primary

Property Damage and Time Element coverage grants in the Policies.  First, Tapestry

contends that the temporary, functional loss of use of covered property itself constitutes

---

[21] The Contamination Exclusion excludes coverage for "**contamination**," which is defined to include, among other things, "any . . . pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent[.]"  As noted above, we do not offer any conclusions concerning the potential applicability of the Contamination Exclusion to Tapestry's claim because that is not encompassed within the certified question.  *See Price v. Murdy*, 462 Md. 145, 147 (2018) (stating that this Court "may go no further than the question certified") (quotation omitted).  It is worth noting, however, that, as set forth in the Communicable Disease Response coverage extension and the Interruption by Communicable Disease additional coverage extension, the Policies do not exclude coverage for all losses resulting from viruses.  They do, however, limit those coverages by imposing a sublimit of liability of $1 million per occurrence as compared to the overall limit of liability of $1 billion per occurrence in each Policy.

[22] Tapestry also argues that FM should be held to a position it articulated in a filing in litigation in federal district court in New Mexico in 2019 that is inconsistent with FM's position here.  However, FM's litigation position in that case does not influence our interpretation of Maryland law here.

"physical loss or damage."  For the reasons set forth above, we have reached a different conclusion.

Second, Tapestry argues that Coronavirus damaged the air in its covered properties, which constitutes "physical loss or damage."  Specifically, Tapestry contends that respiratory particles expelled by individuals infected with Coronavirus physically alter the composition of the air and can remain airborne for indefinite periods unless removed by a ventilation system, which may itself become a transmission vector by spreading the infected particles through vents.  Even if cleaned, removed, or dissipated, such particles are then reintroduced into the air every time a new infected person enters the store.

As an initial matter, Tapestry has not pointed us to any reported decision that supports its contention that damage to the air at a property is covered by a first-party property damage policy.  In the Complaint and in its briefing, Tapestry contends that Coronavirus damages the air in the same way that ammonia does, linking its desired outcome in this case to the outcome in *Gregory Packaging, Inc. v. Travelers Property Casualty Company*, Civ. No. 2:12-cv-04418, 2014 WL 6675934 (D.N.J. Nov. 25, 2014).  However, although that unreported decision interpreting New Jersey and Georgia law did conclude that "the ammonia release physically transformed the air" on the property at issue, the court appears to have based its decision that the insured sustained "direct physical loss or damage" on the insured's functional loss of use of the facility as a result of the contamination, not on damage to the air itself. *Id.* at *3-6. We are not aware of any reported

23

decisions that have treated damage to air itself, as opposed to loss or damage to property resulting from air contamination, as property damage.[23]

But even assuming damage to air could otherwise trigger coverage under the Policies, the allegations of the Complaint do not support a claim that the air in Tapestry's stores was "damaged" in a way that triggers coverage under the Policies. Attaching numerous scientific articles and bulletins, the Complaint sets forth persuasive evidence explaining how Coronavirus particles: are expelled when an infected individual breathes, coughs, or sneezes; enter the air surrounding that individual in droplet or aerosol form; and are then dispersed more widely into the surrounding air for, at least theoretically based on one study, as many as 27 feet. But Tapestry has not explained—or set forth factual allegations that would, if proven, support—how the entry of Coronavirus particles into the air, which particles then travel among and mix with the many other kinds of particles already traveling in the same air until they are further dispersed or ultimately deposited onto a surface, physically damages air over which Tapestry has possessory rights.[24]

---

[23] In an unreported decision that was subsequently vacated by a settlement, the United States District Court for the District of Oregon determined that wildfire smoke physically altered the air of an outdoor theater and, therefore, caused "direct physical loss of or damage to covered property" under the policy at issue. *Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 1:15-CV-01932-CL, 2016 WL 3267247, at \*5, \*9 (D. Or. June 7, 2016), *vacated by settlement*, No. 1:15-CV-01932-CL, 2017 WL 1034203 (D. Or. Mar. 6, 2017). The court reasoned that the insurer had not provided "a sufficient explanation for why air is not physical." *Id.* at \*5. For the reasons already discussed and those discussed below, we are not persuaded.

[24] Tapestry does not allege that the Coronavirus particles transformed other particles in the air by, for example, altering their physical structure. Instead, Tapestry alleges that the Coronavirus particles transformed the air itself by mixing in and traveling with those other particles.

24

Third, Tapestry contends that Coronavirus rested on and adhered to surfaces of property at its stores, which "alter[ed] these objects to become vectors of disease." Tapestry alleges that when the Coronavirus-infected particles settle on a surface, that surface becomes a "fomite" and may remain infectious for days; moreover, if the fomite is disturbed, those particles may reenter the air and then settle on other property, creating more fomites. Tapestry further contends that removing Coronavirus from surfaces requires harsh chemical cleaning and the effectiveness of such cleaning is unknown because of the toxicity and microscopic nature of the particles.

Tapestry's allegation that Coronavirus particles "altered" objects like doorknobs and purses into "vectors of disease" by landing on, adhering to, and being subject to becoming dislodged from them does not satisfy the requirement of "physical loss or damage." Tapestry does not allege that any aspect of its property was either lost or structurally altered by its contact with Coronavirus particles. That particles rested for some period of time on those surfaces and later may have become dislodged and reentered circulation in the air, thus posing a health risk to humans, simply does not constitute damage to property in the absence of a physical or structural alteration of the property. Like Tapestry's allegations concerning the air in its properties, the combination of a virus's proximity to property and resulting risk to human health does not constitute "physical loss or damage" to the property.

As to each of the last two points, Tapestry suggests that there are factual disputes raised by the Complaint that should be left for a jury to decide. Tapestry and its *amicus* United Policyholders contend that in light of the uncertainty surrounding what is still a

relatively new virus as to which the scientific evidence continues to evolve, it is improper for courts to make rulings that essentially amount to factual findings that Coronavirus is not capable of causing "physical loss or damage." But we decide today neither that Coronavirus does not, nor that it cannot, cause "physical loss or damage" as that phrase is used in the Policies. Instead, our decision is that, assuming the truth of all the non-conclusory factual allegations in the Complaint about how Coronavirus operates and how it impacted Tapestry's properties and operations, the presence of Coronavirus in the air and on surfaces at Tapestry's properties did not cause "physical loss or damage" as that phrase is used in the Policies.

### D. Caselaw

Our interpretation of the policy language and application of that interpretation to Tapestry's claim is in accord with the overwhelming majority of reported decisions addressing Coronavirus-related insurance claims under first-party commercial property insurance policies. We will begin by discussing reported decisions that have addressed the issue under Maryland law and then discuss caselaw from other jurisdictions.

Applying Maryland law, the Appellate Court of Maryland (at the time named the Court of Special Appeals of Maryland)[25] and three different judges of the United States District Court have uniformly rejected Coronavirus-related insurance claims under first-party commercial property insurance policies on grounds consistent with our interpretation.

_____

[25] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

26

The most recent of those decisions was our intermediate appellate court's well-reasoned decision in *GPL Enterprise LLC v. Certain Underwriters at Lloyd's*, which addressed many of the same arguments that Tapestry makes here. 254 Md. App. 638 (2022). In *GPL Enterprise*, the insured sought coverage for an interruption of its restaurant operations during the COVID-19 pandemic under an all-risk, first-party property insurance policy. *Id.* at 645-46. Unlike here, the insured premised its insurance claim primarily on the effect of government shutdown orders that precluded it from operating normally during the pandemic, limiting it to carry-out services. *Id.* at 646. Nonetheless, the decision contains an in-depth exploration of the meaning of the policy language "direct physical loss of or damage to Covered Property" and the interpretations courts have given similar language. *See id.* at 650-62.

The intermediate appellate court concluded in *GPL Enterprise* that other courts have held "almost unanimously" "that the phrase 'physical loss of or damage to' property is unambiguous and that the policies afford no coverage in circumstances such as those of this case." *Id.* at 652. The court discussed with approval the United States District Court's determination in *Cordish Cos.*, 573 F. Supp. 3d at 997-98, that the modifier "physical" unambiguously required a "material alteration to the property" and "damage [that] must affect the good itself[.]" *GPL Enter.*, 254 Md. App. at 652-53. Rejecting the insured's contention that a loss of use satisfied the requirements of the coverage grant, the court concluded that "[a] loss of use simply is not the same as a physical loss." *Id.* at 654 (quoting *Santo's Italian Café*, 15 F.4th at 402). As a result, the government shutdown order did not trigger coverage under the policy. *GPL Enter.*, 254 Md. App. at 654.

The court then concluded that, beyond the shutdown order, GPL also failed to "allege[] facts sufficient to establish that the COVID-19 virus somehow physically altered the structure of the restaurant so as to trigger coverage under the policy." *Id.* at 654-55. The court joined in the conclusions of other courts, based on the allegations that were before them, that although Coronavirus causes harm to humans, "it does not physically alter structures and therefore does not result in coverable property loss or damage." *Id.* at 655 (quoting *Cordish Cos.*, 573 F. Supp. 3d at 1000). After rejecting several other arguments made by the insured there—and also made by Tapestry here—the court affirmed the substance of the circuit court's ruling in favor of the insurer. *Id.* at 664.

In three published decisions by different judges applying Maryland law, the United States District Court has reached the same conclusion as our intermediate appellate court concerning the meaning of the key policy language. In each of those decisions, the court interpreted "physical loss or damage" or equivalent language to unambiguously require a structural alteration of property or permanent dispossession. *See Cordish Cos.*, 573 F. Supp. 3d at 997 ("The inclusion of the modifier 'physical' in the phrase 'physical loss or damage' unambiguously requires some form of material alteration to the property that has experienced 'loss or damage.'"); *Hamilton Jewelry, LLC v. Twin City Fire Ins. Co., Inc.*, 560 F. Supp. 3d 956, 967 (D. Md. 2021) ("The presence of the words 'direct' and 'physical' limit the words 'loss' and 'damage' and unambiguously require that the loss be directly tied to a material alteration to the property itself, or an intrusion onto the insured property." (quoting *Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191, 1201-02 (D. Kan. 2020))); *Bel Air Auto Auction, Inc. v. Great N. Ins. Co.*, 534 F. Supp. 3d

28

492, 504 (D. Md. 2021) (observing with approval that the "[n]umerous courts [to] have had the opportunity to directly address the meaning of identical 'direct physical loss or damage' language . . . have overwhelming[ly] held that the phrase requires tangible, physical losses to property, or, at the very least, permanent dispossession of the property rendered unfit or uninhabitable by physical forces").

In two of those cases, the courts expressly concluded that contamination by, or the presence of Coronavirus on, an insured's covered property does not constitute "physical loss or damage."[26] *See Cordish Cos.*, 573 F. Supp. 3d at 999 ("Cordish does not allege that the properties were physically or structurally altered or rendered unusable. Contamination qualifies as physical loss or damage only if it renders the subject property unusable or uninhabitable."); *Bel Air Auto*, 534 F. Supp. 3d at 509 ("[E]ven actual presence of the virus would not be sufficient to trigger coverage for physical damage or physical loss to the property[.]" (quoting *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878, 883 (S.D.W. Va. 2020))).

Other appellate courts have addressed Coronavirus-related insurance claims under the same or similar coverage grants. The vast majority of those have come to the same result based on largely similar reasoning. For example, in *Uncork & Create LLC v. Cincinnati Insurance Company*, the United States Court of Appeals for the Fourth Circuit, applying West Virginia law and similar interpretive principles to those we employ,

---

[26] In the third case, *Hamilton Jewelry, LLC*, the court did not reach that issue because the insured, whose insurance policy included a broad virus exclusion, argued that its losses were caused not by the virus but by government closure orders. 560 F. Supp. 3d at 960. The court rejected that argument. *Id.* at 968.

concluded that "policy language requiring a 'physical loss' or 'physical damage' unambiguously covers only losses caused by, or relating to, material destruction or material harm to the covered property."[27] 27 F.4th 926, 928 (4th Cir. 2022). The insured contended that its "inability to operate its [business] as intended" as a result of both a government "closure order and the C[OVID]-19 virus" constituted "physical loss" under the policy. *Id.* at 930. The court disagreed based both on the plain meaning of the terms and the "plain and unambiguous" language of the policy. *Id.* at 932. As to the latter, the court found especially compelling the policy's definition of the "period of restoration," which established the period for which business income losses could be recovered "as the time needed to 'repair[ ], rebuil[d] or replace[ ]' property or to locate a new permanent property." *Id.* The court concluded that any definition of "'physical loss' or 'physical damage' that does not require a material alteration to the property would render meaningless this pre-condition to coverage[.]"[28] *Id.*

---

[27] The policy language at issue in *Uncork & Create* included the additional modifiers "direct" and "accidental" before both "physical loss" and "physical damage." 27 F.4th at 929. However, because both parties agreed that the pandemic and government closure order were "accidental" and that any loss was "direct," for purposes of the policy, the court "focus[ed its] inquiry on the disputed policy terms 'physical loss' and 'physical damage.'" *Id.* at 931 & n.7.

[28] We reach a different conclusion than did the Fourth Circuit on one point. That court appeared to consider the terms "physical loss" and "physical damage" to be coextensive, both requiring "material destruction or material harm." *Id.* at 932 & nn.8-9. In reaching that conclusion, the court dismissed as "untenable" the "alternative dictionary definition of 'loss' as the 'failure to keep possession' or 'deprivation,'" which the court found to be inconsistent with the "need to repair, rebuild, replace, or expend time securing a new, permanent property" as a pre-condition for coverage in the definition of "period of restoration." *Id.* at 932 & n.9 (quoting *Webster's Third New Int'l Dictionary* 1338 (2002)). As discussed above, we do not see any inconsistency with that alternative definition of "loss" and the Policies' definition of "period of liability," if a "physical loss" is defined to

Based on that definition, and because "neither the [governmental] closure order nor the C[OVID]-19 virus caused present or impending material destruction or material harm that physically altered the covered property requiring repairs or replacement so that they could be used as intended[,]" the court held that the policy did not provide business income loss coverage for the insured's COVID-19-related losses. *Id.* at 933. As a result, after noting that its conclusion was "consistent with the unanimous decisions by our sister circuits," the court affirmed the trial court's dismissal of the insured's complaint seeking coverage. *Id.* at 933-34 (citing federal circuit court cases applying the laws of Texas, New York, Ohio, Illinois, Iowa, California, Oklahoma, and Georgia).

A sampling of other appellate decisions reaching similar interpretations of similar policy language includes: *Estes v. Cincinnati Ins. Co.*, 23 F.4th 695, 700 (6th Cir. 2022) ("[A] covered source itself must destroy covered property or deprive the property's owner of possession."); *Terry Black's Barbecue v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 456 (5th Cir. 2022) (interpreting "'physical loss of property' to require a tangible alteration or deprivation of property" and, accordingly, affirming judgment for the insurer on the pleadings); *10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 220-22 (2d Cir.

---

include the loss of possession of the property. That is because a deprivation of possession of property, unlike a temporary deprivation of functional use of the property, would require "replace[ment]" of that property to resume normal operations. *See, e.g.*, *Estes*, 23 F.4th at 701 (observing that "the phrase 'physical loss' . . . would cover a physical deprivation of property (such as a theft of furniture) that did not damage the property in the slightest"); *Verveine Corp.*, 184 N.E.3d at 1276-77 (observing that "there may be a 'loss of' property without damage if it is stolen"). Because it is not presented here, we will leave to a future case a determination as to whether a temporary loss of possession of property would qualify as "physical loss or damage," or whether any such loss of possession must be permanent.

31

2021) (holding that policy provisions requiring "direct physical loss or damage" or "physical damage" "do not extend to mere loss of use of a premises, where there has been no physical damage to such premises; those terms instead require actual physical loss of or damage to the insured's property"); *Goodwill Indus. of Cent. Oklahoma, Inc. v. Philadelphia Indem. Ins. Co.*, 21 F.4th 704, 708, 710 (10th Cir. 2021) (concluding that coverage trigger requiring "direct physical loss of or damage to property" "unambiguously covered only losses stemming from physical alteration or tangible dispossession of property"); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 333 (7th Cir. 2021) ("The Policy is replete with textual clues that reinforce the conclusion that 'direct physical loss' requires a physical alteration to property."); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 892 (9th Cir. 2021) (affirming dismissal of coverage complaint where insured did not identify either a physical alteration of the property or permanent dispossession of the property); *Santo's Italian Café*, 15 F.4th at 400, 401 (affirming ruling upholding denial of coverage because "[t]he restaurant has not been tangibly destroyed, whether in part or in full. And the owner has not been tangibly or concretely deprived of any of it."); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021) (interpreting similar policy language as requiring that "there must be some physicality to the loss or damage of property—*e.g.*, a physical alteration, physical contamination, or physical destruction[,]" and, in the absence of such allegations, affirming dismissal of coverage complaint); *Indiana Repertory Theatre v. Cincinnati Cas. Co.*, 180 N.E.3d 403, 410 (Ind. Ct. App. 2022) (finding that the insured "did not suffer physical loss or physical damage under the language of the Policy because the premises

32

covered . . . was not destroyed or altered in a physical way that would require restoration or relocation"); and *Verveine Corp.*, 184 N.E.3d at 1275 (concluding, based on both plain meaning and the policy's definition of the "period of restoration," that the policy term "direct physical loss of or damage to" property requires physical alteration; and that "[t]he allegations in the [insured's] complaint do not support recovery under this definition").

Tapestry argues that many of these cases are distinguishable, most prominently because many of the insureds did not allege the actual presence of Coronavirus on their properties or otherwise relied primarily on the effect of governmental shutdown orders, rather than the presence of Coronavirus itself, to support their claims. As an initial matter, although that is true of some of those cases, it is by no means true of all of them. *See, e.g.*, *Verveine Corp.*, 184 N.E.3d at 1276 ("'Even accepting the plaintiffs' premise that the suspension of their business was caused by the 'presence' of the virus on surfaces and in the air at the restaurants . . ., mere 'presence' does not amount to loss or damage to the property."). Moreover, even where that distinction applies, it does not undermine the persuasiveness of the analysis contained in those decisions in interpreting the unambiguous meaning of the key policy language. Tapestry also points out that some of the policies construed in those other cases employed somewhat different policy language, including the use of the modifier "direct" before "physical loss or damage" in some policies. However, it does not appear to us that many, if any, of the other decisions turned on that distinction.

Tapestry points our attention to three relatively recent appellate decisions that have reached a contrary conclusion. In *Cajun Conti LLC v. Certain Underwriters at Lloyd's London*, a split intermediate appellate court in Louisiana concluded that "physical loss or

33

damage," as used in an all-risk, first-party commercial insurance policy, was susceptible to more than one reasonable meaning and so had to be interpreted in favor of the insured. No. 2021-CA-0343, ___ So. 3d ___, 2022 WL 2154863, at *5-6 (La. App. Ct. June 15, 2022). Two dissenting judges on the five-judge panel concluded that the policy language unambiguously required a physical alteration to the property.[29] *Id.*, ___ So. 3d at ___ (Belsome, J., dissenting). In *Marina Pacific Hotel and Suites, LLC v. Fireman's Fund Insurance Company*, a California intermediate appellate court concluded that an insured had sufficiently alleged physical damage to property to survive a motion to dismiss when it alleged that Coronavirus particles "not only live[] on surfaces but also bond[] to surfaces through physicochemical reactions involving cells and surface proteins, which transform the physical condition of the property." 81 Cal. App. 5th 96, 108-09 (2022). And in *Huntington Ingalls Industries, Inc. v. ACE American Insurance Company*, a split Supreme Court of Vermont held that although "direct physical damage" "requires a distinct, demonstrable, physical change to property," the insured's allegations that Coronavirus "can 'adhere' to surfaces, transforming the surface into a fomite," were sufficient to "allege

---

[29] Other courts applying Louisiana law, including at least one of that state's other intermediate appellate courts, have reached a different conclusion than the *Cajun Conti* majority. *See Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.*, 29 F.4th 252, 257-58 (5th Cir. 2022) (Although the "Louisiana Supreme Court has not opined on this language," the court concluded that "[it] would interpret 'direct physical loss of or damage to property' to cover only tangible alterations of, injuries to, and deprivations of property."); *Port Cargo Servs., LLC v. Westchester Surplus Lines Ins. Co.*, No. CV 22-1018, 2022 WL 3576759, at *6 (E.D. La. Aug. 19, 2022), *appeal filed*, *Port Cargo Servs. v. Westchester Surplus Lines Ins.*, No. 22-30594, 5th Cir., 2022 WL 3576759 ("*Cajun Conti* does not change our view of how the Louisiana Supreme Court would rule on the issue").

34

that the virus physically altered property" under Vermont's "'extremely liberal' notice-pleading standards." No. 2021-173, ___ A.3d ___, 2022 WL 4396475, at *11-12 (Vt. Sept. 23, 2022). Two dissenting justices, based on a review of the policy's provisions and the insured's allegations, concluded, "[a]s a matter of law, [that] human-generated droplets containing [Coronavirus] cannot cause 'direct physical loss or damage to property' under this insurance policy." *Id.* at *14 (Carroll, J., dissenting).

Setting aside differences in the underlying policies and allegations at issue in those three cases,[30] we are ultimately persuaded more by the majority of other appellate decisions, which adhere more closely to our own caselaw in examining and construing the plain language of the relevant policy provisions in the context of the policy as a whole.

Tapestry also relies on a number of decisions, many unreported, from other jurisdictions involving other hazardous substances, such as ammonia, asbestos, gaseous fumes, smoke, and cat urine. Some of those cases are distinguishable on one or more

---

[30] Two differences between the case before us and *Marina Pacific Hotel & Suites* appear to have played a significant role in the California court's decision. First, the allegations of the insured appeared to go beyond those made by Tapestry in alleging a physical alteration of the property through "physicochemical reactions involving cells and surface proteins." 81 Cal. App. 5th at 108. It is unclear to us whether those alleged reactions went beyond simply adhering to a surface, but the court seemed to treat them that way. *See id.* at 110. Second, the interruption by communicable disease coverage in the policy at issue provided coverage if a suspension of business was "due to direct physical loss or damage to property . . . caused by or resulting from a covered communicable disease event," which the court interpreted as establishing that the policy itself contemplated that communicable diseases *could* cause direct "physical loss or damage." *Id.* at 100. As discussed above, the Interruption by Communicable Disease coverage extension in the Policies does not require "physical loss or damage" and we do not rule out that a communicable disease *could* cause "physical loss or damage" to property. We reach no conclusion concerning how those factors might have affected our analysis if they were involved here.

35

grounds, including that: (1) some involved the physical alteration of property;[31] (2) others involved hazards that rendered the property "practically useless for anything," *Santo's Italian Café*, 15 F.4th at 405, as opposed to just for the insured's intended purpose;[32] or (3) contained different policy language, *see TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 709 (E.D. Va. 2010) (noting that the "Policy . . . define[d] 'Property Damage' to include 'loss of use of tangible property'"), *aff'd*, 504 F. App'x 251 (4th Cir. 2013).  Those features do not distinguish all the cases.[33]  However, to the extent they are not materially

---

[31] *See Nat'l Ink & Stitch, LLC v. State Auto Prop. & Cas. Co.*, 435 F. Supp. 3d 679, 680-81 (D. Md. 2020) (finding "direct physical loss" where a computer needed to be replaced because of damage sustained in a ransomware attack); *Mellin v. N. Sec. Ins. Co.*, 115 A.3d 799, 805 (N.H. 2015) (in connection with a claim arising from saturation of property with cat urine, interpreting "physical loss" to require "a distinct and demonstrable alteration of the insured property," but concluding that alteration of a property's smell by the pervasive odor of cat urine qualified); *Farmers Ins. Co. v. Trutanich*, 858 P.2d 1332, 1334-35 (Or. Ct. App. 1993) (concluding that the pervasive odor of methamphetamine in a house caused "physical damage" to the house).

[32] *See Gregory Packaging, Inc. v. Travelers Prop. Cas. Co.*, Civ. No. 2:12-cv-04418, 2014 WL 6675934, *3-4 (D.N.J. Nov. 25, 2014) (concluding that ammonia discharge in facility resulted in "direct physical loss" under insurance policy because it "rendered [the insured's] facility physically unfit for normal human occupancy and continued use until the ammonia was sufficiently dissipated"); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 709 (E.D. Va. 2010) (concluding that emission of sulfuric gas into a residence from defective drywall constituted "direct physical loss" because it rendered the property entirely unusable), *aff'd*, 504 F. App'x 251 (4th Cir. 2013); *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 759 F. Supp. 2d 822 (E.D. La. 2010) (same); *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 54-55 (Colo. 1968) (concluding that an insured suffered "direct physical loss" when gasoline infiltrated "the soil under and around the building," and then "gasoline and vapors thereof infiltrated and contaminated the foundation and halls and rooms of the . . . building, making the same uninhabitable and making the use of the building dangerous"); *Bd. of Educ. v. Int'l Ins. Co.*, 720 N.E.2d 622, 624 (Ill. App. Ct. 1999) (determining that the release of asbestos fibers on property constituted "physical loss or damage" to property).

[33] *See, e.g.*, *Oregon Shakespeare Festival Ass'n v. Great Am. Ins.*, No. 1:15-CV-01932-CL, 2016 WL 3267247, at *9 (D. Or. June 7, 2016) (concluding that smoke, soot,

distinguishable, we find the analyses in those cases unpersuasive, at least as applied to the Policies and the allegations of the Complaint, for the reasons already discussed.

Finally, Tapestry also claims support from this Court's recent decision in *Berry v. Queen*, 469 Md. 674 (2020). In *Berry*, the Court confronted "whether the phrase 'damage to property' . . . in the uninsured motorist statute[] requires an insurer to reimburse loss of use damages, such as rental car costs, to an insured." *Id.* at 679. We held that it did. *Id.* at 685. Notably, however, the question was raised in the context of unquestioned physical damage to an automobile that required repair. *Id.* at 683. As the United States District Court correctly observed, *Berry* does not stand for the proposition "that a policyholder could make an uninsured motorist claim for rental car coverage every time it suffered a 'loss of use' of a vehicle untethered to physical damage to that vehicle." *Bel Air Auto*, 534 F. Supp. 3d at 504.

## CONCLUSION[34]

The certified question posed to this Court, as we have reformulated it, is:

---

and ash in the air of a partially outdoor theater from a nearby wildfire constituted "direct physical loss of or damage to covered property" when theater had to postpone performances), *vacated by settlement*, No. 1:15-CV-01932-CL, 2017 WL 1034203 (D. Or. Mar. 6, 2017); *Matzner v. Seaco Ins. Co.*, No. CIV. A. 96-0498-B, 1998 WL 566658, at *3 (Mass. Super. Ct. Aug. 12, 1998) (in addressing a claim arising from carbon-monoxide contamination in an apartment building, concluding that the phrase "direct physical loss or damage" is ambiguous and could include "a wider array of losses" beyond "tangible damage to the structure of insured property").

[34] The Court wishes to acknowledge the very helpful amicus submissions provided in this case by the American Property Casualty Insurance Association and National Association of Mutual Insurance; Amphenol Corporation and Amphenol (Maryland), Inc.; Bel Air Auto Auction, Inc.; Cinemark Holdings, Inc.; The Cordish Companies, Inc.; MedChi, The Maryland State Medical Society; and United Policyholders.

When a first-party, all-risk property insurance policy covers "all risks of physical loss or damage" to insured property from any cause unless excluded, is coverage triggered when a toxic, noxious, or hazardous substance—such as Coronavirus or COVID-19—is physically present in the indoor air of that property; is also present on, adheres to, and can later be dislodged from physical items on the property; and causes a loss, either in whole or in part, of the functional use of the property?

For the reasons set forth in this opinion, our answer is: No, provided the substance causes neither tangible, concrete, and material harm to the property nor deprivation of possession of the property.

**CERTIFIED QUESTION OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**