*CareFirst BlueChoice, Inc. v. Matthew Skipper, et al.*, No. 21, September Term, 2025.

**STANDING – MOOTNESS EXCEPTION IN CLASS ACTION SUITS**

When a putative class action is initially filed in another court and the defendant tenders individual relief to the putative class representative before the case is dismissed for lack of jurisdiction, substantially the same complaint promptly filed in state court will not be considered moot until the representative has had a reasonable opportunity to seek class certification.

**STATUTORY AND REGULATORY INTERPRETATION – IN-VITRO FERTILIZATION INSURANCE MANDATE**

Insurance Article § 15-810(c) requires insurers to cover expenses arising from in-vitro fertilization to the same extent as expenses arising from other pregnancy-related procedures. The interplay of the Maryland Insurance Administration Bulletin 13-01 and Code of Maryland Regulations 31.11.06.06B(11) does not permit insurers to exclude coverage for in-vitro fertilization benefits in individual health insurance policies purchased through the Health Benefit Exchange.

**CONTRACT INTERPRETATION**

An exclusion in an individual health insurance policy for "[o]vum transplants and gamete intra-fallopian tube transfer, zygote intra-fallopian transfer, or cryogenic or other preservation techniques used in these or similar procedures" does not authorize the exclusion of any medically necessary expenses arising from in-vitro fertilization procedures.

IN THE SUPREME COURT

OF MARYLAND

No. 21

September Term, 2025

_____

CAREFIRST BLUECHOICE, INC.

v.

MATTHEW SKIPPER, ET AL.

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Fader, C.J.
Biran and Gould, JJ., dissent.

_____

Filed: April 27, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The primary question in this case is whether the petitioner, CareFirst BlueChoice, Inc., breached its contractual obligation to its insureds, respondents Matthew and Jamie Skipper, when it denied coverage for embryo thawing in connection with an in-vitro fertilization ("IVF") procedure.[1]  The answer turns on the proper interpretation of a policy exclusion for "[o]vum transplants and gamete intra-fallopian tube transfer, zygote intra-fallopian transfer, or cryogenic or other preservation techniques used in these or similar procedures[.]"  Informed by the underlying statutory and regulatory background, we hold that the provision does not authorize the exclusion of any expenses associated with IVF procedures, including the expense of embryo thawing if that is a medically necessary component of IVF treatment.

Additionally, a threshold issue, which we will address first, is whether the Skippers have standing to maintain this putative class action.  The Skippers seek to be certified as class representatives for a class of plaintiffs for whom CareFirst allegedly wrongfully denied coverage for embryo thawing in connection with IVF.  In the Skippers' case, CareFirst reversed its initial denial of coverage for IVF-related embryo thawing and paid

---

[1] IVF is an "assisted reproductive technology" that helps people who experience infertility conceive.  *In vitro fertilization (IVF)*, Mayo Clinic (Sept. 1, 2023), https://www.mayoclinic.org/tests-procedures/in-vitro-fertilization/about/pac-20384716, *archived at* https://perma.cc/36DK-YX8W; *Infertility*, World Health Organization (Nov. 28, 2025), https://www.who.int/news-room/fact-sheets/detail/infertility, *archived at* https://perma.cc/N748-DU5G (defining infertility as the inability to conceive after one year of regular unprotected sexual intercourse).  While undergoing IVF treatment, patients receive hormone injections to produce a "healthy" and "mature" egg that is then retrieved and fertilized using sperm. *In vitro fertilization (IVF)*, Mayo Clinic, above.  After an embryo has developed, it is either frozen for later transfer or immediately transferred into the uterine cavity.  *Id.*

their claim in full, but only after the Skippers filed a complaint with the Maryland Insurance Administration (the "Administration") and a putative class action complaint in the United States District Court for the District of Maryland. CareFirst contends that its payment of the Skippers' claim moots the present case, which the Skippers filed in the Circuit Court for Prince George's County after the federal court dismissed their original complaint for lack of jurisdiction. We hold that the Skippers have standing based on our analysis in *Frazier v. Castle Ford, LTD.*, in which we held that a class action defendant's tender of individual relief to a putative class representative does not moot a class action lawsuit before the representative has a reasonable opportunity to seek class certification. 430 Md. 144, 161 (2013). We now extend that holding to the scenario presented here, in which a class action lawsuit is first filed in another court, dismissed for lack of jurisdiction, and promptly refiled in substantially the same form in state court.

We agree with the Appellate Court of Maryland that the circuit court erred in dismissing the Skippers' complaint for lack of standing. We also agree that the circuit court's order cannot be affirmed on the alternative ground that it fails to state a claim on which relief can be granted. Accordingly, we will affirm the Appellate Court's judgment and remand for further proceedings.

# BACKGROUND

### A.    Factual Background[2]

#### 1.    The Policy

CareFirst issued a BlueChoice HMO Silver Policy to Mr. Skipper, with Ms. Skipper enrolled as a dependent (the "Policy"). The Policy, which Mr. Skipper obtained through the Maryland Health Benefit Exchange, had an effective date of January 1, 2018, with an initial term of one year.

The Policy identifies the benefits covered for "Maternity and Related Services" in § 1.5.D. of Attachment B to the Policy, stating that "[b]enefits will be provided for," among other things, preventive outpatient obstetrical care, prenatal testing, preventive testing of a newborn, breastfeeding support, outpatient obstetrical care and professional services for all complications, birthing classes, inpatient care for delivery, routine professional services rendered to the newborn during the hospitalization for delivery, elective abortion, and postpartum home visits.

Section 1.5.F. of Attachment B describes the benefits covered for infertility services, including "[a]ssisted reproductive technologies as described and limited" in that section. With respect to IVF, the Policy provides that "[b]enefits are available when" the subscriber and spouse meet certain criteria, including demonstrated infertility and previous

---

[2] Because the Skippers appeal the circuit court's grant of a motion to dismiss, we "assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them[.]" *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643 (2010).

unsuccessful attempts to become pregnant using less costly alternative treatments. When the criteria are met, "[b]enefits are available to the Subscriber or the dependent Spouse of the Subscriber," limited to three attempts per live birth. The Policy requires prior authorization.

Section 16 of Attachment B identifies policy exclusions. One such exclusion, Exclusion 16.11, applies to "[o]vum transplants and gamete intra-fallopian tube transfer, zygote intra-fallopian transfer, or cryogenic or other preservation techniques used in these or similar procedures."

Attachment C to the Policy provides a schedule of benefits. Attachment C identifies an individual benefit period deductible of $3,500, a family benefit period deductible of $7,000, an individual out-of-pocket maximum of $7,350, and a family out-of-pocket maximum of $14,700. Attachment C also provides a "benefit chart" identifying the required co-pays per benefit. For example, standard outpatient visits to a physician's office or for outpatient non-surgical services are subject to $30 co-pays for primary care providers, $40 co-pays for specialists, and $100 co-pays if the visit is to the outpatient department of a hospital or hospital clinic. Co-pays for both general maternity services and IVF services are subject to $30 co-pays per visit generally or $100 if the visit is to the outpatient department of a hospital or hospital clinic.

### 2. The Skippers' Claim

The Skippers experienced years of diagnosed infertility before obtaining CareFirst insurance. In 2016, having achieved no success from more conservative fertility methods,

4

the Skippers froze four embryos and had two of them transferred, resulting in a successful pregnancy.

In 2018, now insured by CareFirst, the Skippers sought pre-authorization for IVF treatment for a subsequent pregnancy. CareFirst authorized three rounds of IVF treatment, with the exception of the cost of embryo thawing, which it asserted was not a covered benefit. The Skippers proceeded with the IVF treatment, paying the $900 cost of the embryo thawing themselves.

The Skippers appealed CareFirst's denial of coverage two years later, in June 2020. CareFirst denied the appeal as untimely because it was filed after the 180-day period allowed by the Policy.

The Skippers filed a complaint with the Administration in November 2020, alleging that CareFirst had engaged in unfair claim settlement practices and seeking a declaration that CareFirst must pay the cost they had incurred to unfreeze the embryos and other relief, including pre- and post-judgment interest. In its answer, CareFirst asserted both that the Skippers' appeal was untimely and that Exclusion 16.11 authorized the partial coverage denial.

### B.    Procedural History

In April 2021, while the complaint filed with the Administration was still pending, the Skippers filed a putative class action lawsuit in the United States District Court for the District of Maryland. *See* Complaint, *Skipper et al. v. CareFirst BlueChoice, Inc.*, No. 8:21-cv-01022 (D. Md. April 27, 2021). As detailed in the second amended complaint

5

filed in that court, the Skippers sought certification of a class of all persons in Maryland who, within the limitations period, received coverage for IVF services but not for related embryo thawing under a CareFirst policy. Second Amended Complaint at 9, *Skipper et al. v. CareFirst BlueChoice, Inc.*, No. 8:21-cv-01022 (D. Md. Nov. 15, 2021). In the complaint, the Skippers brought counts for breach of contract, negligent misrepresentation, and declaratory judgment, and sought relief in the forms of class certification, actual damages, attorney's fees and costs, pre-judgment and post-judgment interest, injunctive relief, and declaratory relief. *Id.* at 12-16.

On May 20, 2021, 23 days after the Skippers filed their federal complaint, CareFirst "change[d] its position," issued a new explanation of benefits, and reimbursed the Skippers' medical provider for the cost of the embryo thawing. Based on that change in position, the Administration closed the Skippers' claim.

On March 8, 2023, the federal district court dismissed the Skippers' class action complaint, determining that the court lacked jurisdiction over the lawsuit because it did not meet the $5 million threshold under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). *Skipper v. CareFirst BlueChoice, Inc.*, No. DLB-21-1022, 2023 WL 2410858, at *1-2 (D. Md. Mar. 8, 2023); *see* 28 U.S.C. § 1332(d)(2) (providing federal district courts with original jurisdiction over class actions only if "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs").

Fifteen days following the federal court's dismissal order, the Skippers filed their state court complaint in the Circuit Court for Prince George's County. The factual

6

allegations, proposed class definition and allegations, counts, and relief sought in the state court complaint mirror those of the dismissed federal court complaint. In the state court complaint, the Skippers noted that "[t]his matter was previously filed" in federal court and dismissed for lack of jurisdiction. Accordingly, the complaint states, it was being filed pursuant to Maryland Rule 2-101, which provides that "if an action is filed in a United States District Court . . . within the period of limitations prescribed by Maryland law and that court enters an order of dismissal . . . for lack of jurisdiction[,] . . . an action filed in a circuit court within 30 days after the entry of the order of dismissal shall be treated as timely filed in this State."

CareFirst moved to dismiss on two grounds: (1) that its $900 reimbursement had mooted the Skippers' claim and (2) that the Skippers failed to state a claim on which relief could be granted because benefits for embryo thawing are excluded under the Policy and are not required by Maryland law. The circuit court granted the motion based on mootness and did not address CareFirst's contention that the complaint failed to state a claim.

The Appellate Court of Maryland reversed. *Skipper v. CareFirst BlueChoice, Inc.*, 264 Md. App. 631, 639 (2025). The Appellate Court held that the Skippers' claim was not moot because the $900 payment did not satisfy the Skippers' claims for pre-judgment interest, declaratory relief, and injunctive relief. *Id.* at 649-50. And even if the payment accorded complete relief to the Skippers, the Appellate Court held that under the rationale of our decision in *Frazier v. Castle Ford, LTD.*, 430 Md. 144 (2013), CareFirst could not render a claim moot by "picking off" the class representative in a putative class action via

7

payment before the plaintiff had a reasonable opportunity to seek class certification. *Skipper*, 264 Md. App. at 653.

The Appellate Court also held that the Skippers stated a claim on which relief could be granted. *Id.* at 656-59. The Appellate Court determined that the complaint raised a factual dispute concerning whether IVF is a similar procedure to those identified in Exclusion 16.11, and so was not susceptible to resolution on a motion to dismiss. *Id.* at 658. Accordingly, the Appellate Court reversed the circuit court and remanded for further proceedings. *Id.* at 659.

We granted CareFirst's petition for writ of certiorari, *CareFirst BlueChoice, Inc. v. Skipper*, 490 Md. 631 (2025), to determine whether the Appellate Court erred in concluding that the Skippers have standing to pursue their claims and that their claims did not fail as a matter of law.

## DISCUSSION

### I. STANDARD OF REVIEW

A motion to dismiss should be granted when "the allegations presented do not state a cause of action." *Wheeling v. Selene Fin. LP*, 473 Md. 356, 374 (2021). We review a grant of a motion to dismiss without deference to determine "whether the trial court was legally correct." *D.L. v. Sheppard Pratt Health Sys., Inc.*, 465 Md. 339, 350 (2019) (quoting *Blackstone v. Sharma*, 461 Md. 87, 110 (2018)). In doing so, we "assume the truth of all relevant and material facts that are well pleaded and all inferences which can

8

reasonably be drawn from those pleadings." *Hancock v. Mayor & City Council of Baltimore*, 480 Md. 588, 603 (2022) (quoting *Wheeling*, 473 Md. at 374).

Standing is a question of law that we review without deference. *See Kendall v. Howard County*, 431 Md. 590, 602 (2013).

## II.  STANDING

Preliminarily, we must address whether the Skippers have standing in light of CareFirst's reversal of its denial of coverage shortly after the Skippers filed suit in federal court.  CareFirst contends that its payment of the claim rendered this lawsuit moot.  The Skippers argue that the case is not moot and that they have standing for three reasons.  First, they contend they have standing because, in addition to their claim for damages, their complaint also seeks declaratory and injunctive relief.  They argue that even though there is no present controversy concerning a request for coverage for embryo thawing, the courts should nonetheless entertain their requests for equitable relief pursuant to exceptions to mootness for claims that are "capable of repetition, yet evading review," and for an "issue of public importance [that] affects an identifiable group for whom the complaining party is an appropriate surrogate[.]"  (Quoting *Powell v. Md. Dep't of Health*, 455 Md. 520, 540-41 (2017)).

Second, the Skippers assert that the case is not moot and that they have standing to pursue their claim for pre-judgment interest based on the loss of use of funds from the time CareFirst should have paid their claim until it did.

9

Third, the Skippers contend that CareFirst's delayed payment of their claim constitutes a "naked effort to moot a potential class action" that is barred by the reasoning of *Frazier*. Because we agree that our analysis in *Frazier* supports the Skippers' claim to standing here, we will not address the other standing arguments.

"A case is moot when there is no longer an existing controversy when the case comes before the Court or when there is no longer an effective remedy the Court could grant." *Suter v. Stuckey*, 402 Md. 211, 219 (2007). Generally, courts do not entertain moot controversies. *Id.*; *State v. Ficker*, 266 Md. 500, 506-07 (1972) ("Appellate courts do not sit to give opinions on abstract propositions or moot questions, and appeals which present nothing else for decision are dismissed as a matter of course."). The question before us is whether CareFirst's reversal of its coverage denial for the Skippers' embryo thawing mooted the Skippers' putative class action complaint. We find the answer in our decision in *Frazier*.

In *Frazier*, we began our discussion by observing that an important purpose served by class action litigation "is to allow a remedy for modest individual claims." 430 Md. at 153. We observed that where separate litigation of a "multiplicity of small individual suits for damages" is not economically feasible, "aggrieved persons may be without any effective redress unless they may employ the class-action device." *Id.* (quoting *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980)). To maintain a class action requires a class representative whose claims are typical of the class. *Frazier*, 430 Md. at 153; *see* Md. Rule 2-231(b) ("One or more members of a plaintiff class may sue as representative

10

parties on behalf of all only if . . . the claims of the representative parties are typical of the claims of the class[.]”).

Mr. Frazier filed a class action complaint against Crystal Ford, which he alleged had misrepresented the term of an extended manufacturer's warranty to him and other members of the putative class, causing him to incur “unanticipated repair expenses” for his vehicle. *Frazier*, 430 Md. at 148-49, 154. After he filed his complaint, Crystal Ford paid to extend his warranty, which caused the warranty company to issue him “a check for the amounts he had paid for the repairs,” less a deductible. *Id.* at 150. The question before us was whether Crystal Ford's action in extending the warranty rendered Mr. Frazier incapable of serving as a class representative, because he no longer had a claim like those of the members of the putative class. *Id.* at 156.

Observing that “mootness is a ‘more flexible’ concept in the context of class action litigation[,]” *id.* (quoting *Creveling v. GEICO*, 376 Md. 72, 83-87 n.3 (2003)), we concluded that a rule allowing a “defendant [to] moot a putative class action by tendering individual damages prior to certification of the class” would be unwise, *Frazier*, 430 Md. at 157. That is because “[i]f all a defendant need do to defeat a class action is to satisfy the class representative's claim immediately after suit is filed, many meritorious class actions will never get off the ground.” *Id.* That would especially be the case when “each claim, including the class representative's, is small or moderate in size—a type of case for which the class action procedure was devised.” *Id.* at 158. We recognized that if we were to condone Crystal Ford's tactic, “recourse to legal remedy [for other purchasers] would not

11

be economically feasible." *Id.* at 154. Accordingly, we concluded that "the better rule is to . . . hold that a tender of individual relief to the putative class representative does not moot a class action if the individual plaintiff has not had a reasonable opportunity to seek class certification, including any necessary discovery."[3] *Id.* at 160-61.

CareFirst contends that *Frazier* does not apply here because it made its decision to reverse its denial of coverage to resolve the Skippers' complaint filed with the Administration, not this litigation and because the payment occurred during the pendency of the federal suit, not this litigation.[4] The Skippers respond that this lawsuit is a

---

[3] As pointed out by amici, other courts, including the United States Supreme Court, have also recognized a more flexible mootness inquiry for similar reasons in class action suits. *See, e.g.*, *Roper*, 445 U.S. at 339 ("[If mootness] by a defendant's tender of judgment before an affirmative ruling on class certification could be obtained, [it] obviously would frustrate the objectives of class actions[.]") (citation modified); *Richardson v. Bledsoe*, 829 F.3d 273, 284-85 (3d Cir. 2016) ("If such an exception to mootness [in instances of a 'pick off'] were not adopted, . . . it would effectively ensure that claims that are too economically insignificant to be brought on their own would never have their day in court. The effect would be to broadly undermine the purpose of Rule 23 and class action litigation." (citation modified)); *Sos v. State Farm Mut. Auto. Ins. Co.*, No. 21-11769, 2023 WL 5608014, at *1 (11th Cir. Aug. 30, 2023) ("We have twice held [once in *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030 (5th Cir. 1981) and again in *Stein v. Buccaneers Ltd.*, 772 F.3d 698 (11th Cir. 2014)] that a defendant cannot moot a class action lawsuit by buying off the individual claims of the named plaintiff. . . . We have explained that a contrary rule would give defendants the option to preclude a viable class action from ever reaching the certification stage[.]" (citation modified)).

[4] In its brief, CareFirst contends that "[u]nlike in *Frazier*, payment was made to the Skippers to end the [Administration] complaint, not to moot the class action in which [Mr. Frazier] still maintained a claim for punitive damages[.]" CareFirst's contention is unavailing for two reasons. First, nothing in the record supports CareFirst's contention that its payment was intended to resolve the Skippers' complaint filed with the Administration and not the class action lawsuit. Circumstantial evidence suggests the opposite, given that the coverage reversal was made 23 days after the class action complaint

12

continuation of the lawsuit they initially filed in federal court and that the rationale underlying our decision in *Frazier* fully applies here. We agree with the Skippers.

CareFirst reversed its coverage decision 23 days after the Skippers filed their putative class action in federal court. Fifteen days after the federal court dismissed the complaint for lack of jurisdiction based on the Class Action Fairness Act, the Skippers filed their complaint in the Circuit Court for Prince George's County. That complaint is identical in every material respect to the dismissed federal complaint. CareFirst then moved to dismiss the new complaint for, among other reasons, mootness based on its coverage reversal.

Notwithstanding the dismissal in federal court and re-filing in state court, the circumstances here give rise to the precise concern animating our decision in *Frazier*. Under these circumstances, we agree with the Appellate Court that there is no material difference whether CareFirst attempted to moot this case when it was pending in federal court or only after it was refiled in state court. *Skipper*, 264 Md. App. at 655 n.10. In either circumstance, allowing payment of the class representative's claim to moot the case would frustrate the purpose of the class action mechanism. We therefore extend our

was filed and approximately six months after the complaint was made to the Administration. Although we cannot resolve the factual question of CareFirst's motivation for its coverage reversal, we need not do so because the significant fact for these purposes is that the reversal was made while the class action litigation was pending. Second, Mr. Frazier's claim for punitive damages, and whether it could be maintained after compensatory damages had been tendered, was a separate issue in *Frazier*, not linked to the Court's resolution of mootness of the class claims. *See* 430 Md. at 161-64.

13

holding in *Frazier* to cover class action cases that are initially filed in another court, dismissed for lack of jurisdiction, and promptly refiled in substantially the same form in state court.[5]  In such circumstances, "a tender of individual relief to the putative class representative" made while the case was pending in the other court "does not moot a class action if the individual plaintiff has not had a reasonable opportunity to seek class certification, including any necessary discovery." *Frazier*, 430 Md. at 161.

Here, CareFirst has not alleged that the Skippers had a reasonable opportunity to seek class certification either in federal court or in state court.  The record here and the docket in federal court suggest that they did not have that opportunity.  Accordingly, based on the record before us, we conclude that the Skippers' class action complaint is not moot and that they have standing.  We will therefore affirm the Appellate Court's holding that the circuit court erred in granting CareFirst's motion to dismiss on the basis of standing.

## III.   THE POLICY DOES NOT EXCLUDE COVERAGE FOR MEDICALLY NECESSARY EXPENSES ARISING FROM IVF PROCEDURES.

### A.   Principles of Interpretation

The Skippers' claims are based on the Policy, their insurance contract with CareFirst.  We recently summarized the proper analysis for interpreting the terms of insurance policies:

---

[5] For these purposes, we would consider a complaint to be promptly filed in state court if it is filed within the time permitted by Rule 2-101(b), which treats actions refiled in a court of this state as timely for statute of limitations purposes if they are refiled within 30 days after dismissal on certain grounds by a United States District Court or court of another state.

14

[We] construe the language of insurance policies, . . . according to contract principles, under the objective theory of contract interpretation[.] Under that approach, unless the language of the contract is ambiguous, we interpret it based on what a reasonable person in the position of the parties would have understood the language to mean and not the subjective intent of the parties at the time of formation. Thus, the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract.

A court interpreting an insurance policy is to examine the instrument as a whole, focusing on the character, purpose, and circumstances surrounding the execution of the contract. If language in an insurance policy is ambiguous when interpreted according to the principles of contract interpretation set forth above, we construe that language liberally in favor of the insured and against the insurer as drafter of the instrument. A contract is ambiguous if, when viewed from a reasonable person perspective, that language is susceptible to more than one meaning. However, merely because a term cannot be precisely defined so as to make clear its application in all varying factual situations does not mean that it is ambiguous.

*Tapestry, Inc. v. Factory Mut. Ins. Co.*, 482 Md. 223, 239-40 (2022) (citation modified).

Three additional principles apply here. First, when policy "language is identical to the statutory text, it is reasonable to infer" that an insurer "intended to give it the same meaning given to the statute." *State Farm Mut. Auto. Ins. Co. v. DeHaan*, 393 Md. 163, 194 (2006). Second, "[o]ur cases make indelibly clear that Maryland adheres to the general rule that parties to a contract are presumed to contract mindful of the existing law and that all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intention is evident." *Wright v. Com. & Sav. Bank*, 297 Md. 148, 153 (1983). And third, "[a]n insurance contract . . . is measured

15

by its terms unless a statute, a regulation, or public policy is violated thereby." *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985).

The Policy's coverage for IVF procedures and Exclusion 16.11 exist against the backdrop of Maryland's applicable statutory and regulatory structure concerning coverage for maternity care generally and IVF treatments specifically. We therefore begin with a discussion of that statutory and regulatory structure.

### B.    Section 15-810 of the Insurance Article

In 1985, Maryland became the first state to mandate insurance coverage for expenses of IVF procedures, enacting the provision now codified at § 15-810 of the Insurance Article. Eli Adashi & William Schlaff, *Against All Odds: The First State Infertility Mandate (Maryland)*, 110 Fertility & Sterility 824, 824 (2018). Section 15-810 sits within Subtitle 8 of Title 15 of the Insurance Article, which addresses "Required Health Insurance Benefits."

Benefits for IVF under § 15-810 apply generally to, among others, "insurers . . . that provide hospital, medical, or surgical benefits to individuals or groups on an expense-incurred basis under health insurance policies that are issued or delivered in" Maryland. Md. Code Ann., Ins. § 15-810(a)(1) (2017 Repl.; 2025 Supp.). The IVF coverage mandate is contained in § 15-810(c)(2) and (3), which provide:

> (2) An entity subject to this section that provides pregnancy-related benefits may not exclude benefits for all outpatient expenses arising from in vitro fertilization procedures performed on a policyholder or subscriber or on the dependent spouse of a policyholder or subscriber.

> (3) The benefits under this subsection shall be provided:

16

> > (i) for insurers . . . , to the same extent as the benefits provided for other pregnancy-related procedures;
>
> . . .

Notably for our discussion later, the IVF coverage mandate "does not apply to insurers . . . that provide hospital, medical, or surgical benefits under health insurance policies or contracts . . . that are issued or delivered to a small employer in the State[,]" if "the Administration has determined that [IVF] procedures are not essential health benefits[.]" *Id.* § 15-810(c)(1). The statutory coverage mandate thus exempts policies issued to small employers, but not to individuals like the Skippers.

The Skippers argue that, together, § 15-810(c)(2) and (3) mandate coverage for benefits related to all IVF procedures to the same extent as benefits provided for other pregnancy-related procedures. CareFirst argues that § 15-810(c)(2) permits it to exclude benefits for certain expenses associated with IVF procedures, including embryo thawing, because precluding it from excluding benefits for "all" outpatient IVF procedures does not preclude it from excluding some. According to CareFirst, if the General Assembly meant to require coverage for all expenses related to IVF treatment, the statute would prohibit it from excluding "any," rather than "all," expenses. The Skippers respond that CareFirst's interpretation runs counter to § 15-810(c)(3), which mandates that benefits be provided "to the same extent as the benefits provided for other pregnancy-related procedures[.]" Thus, they argue, all expenses associated with IVF treatment must be covered to the same extent an insurer covers expenses for other pregnancy-related procedures.

In resolving that dispute, we employ our familiar canons of statutory construction. As we summarized recently:

> The goal of statutory construction is to discern and carry out the intent of the Legislature. Our search for legislative intent begins with the text of the provision we are interpreting, viewed not in isolation but within the context of the statutory scheme to which it belongs. Our review of the text is wholistic, seeking to give effect to all of what the General Assembly included and not to add anything that the General Assembly omitted. In our analysis of statutory text, we therefore take the language as we find it, neither adding to nor deleting from it; we avoid forced or subtle interpretations; and we avoid constructions that would negate portions of the language or render them meaningless. . . .

> Finally, in every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense. When one interpretation of statutory language would produce such a result, we will reject that interpretation in favor of another that does not suffer the same flaw.

*Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644-46 (2024) (citation modified).

Section 15-810(c)(2) prohibits insurers from excluding "benefits for all outpatient expenses arising from in vitro fertilization procedures." If § 15-810(c)(2) prohibited insurers from excluding benefits for all *services* associated with IVF procedures, and if the statute lacked subsection (c)(3), CareFirst's argument might be more persuasive. But subsection (c)(2) prohibits insurers from excluding benefits for all outpatient *expenses* arising from IVF procedures. And subsection (c)(3) requires treating IVF procedures the same as other pregnancy-related procedures.

We agree with the Skippers that, reading subsections (c)(2) and (3) together, the only reasonable interpretation of the plain language is that insurers must cover the expenses arising from IVF procedures to the same extent as expenses arising from other pregnancy-

18

related procedures—which is to say, subject to the same terms, deductibles, co-pays, and limitations. In other words, insurers may not exclude benefits for "all" outpatient expenses arising out of IVF procedures, but they may exclude benefits for the same portion of those expenses they also do not pay in connection with other pregnancy-related procedures. Nothing in the statute suggests that insurers can cover only some medically necessary services arising from IVF procedures and exclude all expenses associated with others.

To make our analysis concrete, we consider the Policy's treatment of deductibles and co-pays. The schedule of benefits identifies an overall individual benefit deductible of $3,500, and then, for each service provided, specifies whether the service is subject to the deductible and whether a co-pay applies. With respect to general maternity services and IVF services, the relevant deductible and copay provisions identified on the schedule of benefits are as follows:

| SERVICE | SUBJECT TO DEDUCTIBLE? | MEMBER PAYS |
|---|---|---|
| [Maternity and Related Services] Non-Preventive Visit | Professional: No Clinic Visit: Yes | $30 per visit **and** $100 per visit if rendered in the outpatient department of a hospital/hospital clinic or provider's office located in a hospital or hospital clinic |
| In Vitro Fertilization[6] | Professional: No Clinic Visit: Yes | $30 per visit **and** $100 per visit if rendered in the outpatient department of a hospital/hospital clinic or provider's office located in a hospital or hospital clinic |

With respect to deductibles and co-pays, therefore, the Policy treats standard pregnancy-related procedures and IVF procedures the same. This reading of the policy appears to comply with the statutory mandate—even though CareFirst is not covering "all" expenses arising from IVF procedures, it is covering those expenses to the same extent it covers other pregnancy-related expenses.[7] But if CareFirst were to exclude coverage for

---

[6] The table in the schedule of benefits includes a fourth column, situated between SERVICE and SUBJECT TO DEDUCTIBLE?, titled LIMITATIONS. The limitations field is blank with respect to non-preventative maternity and related services. With respect to IVF services, however, the field states: "Limited to 3 attempts per live birth. Prior authorization is required." Notably, the three attempts limitation is expressly permitted by § 15-810(e), which provides: "An entity subject to this section may limit coverage of the benefits for in vitro fertilization required under this section to three in vitro fertilization attempts per live birth, not to exceed a maximum lifetime benefit of $100,000." The prior authorization requirement does not appear to implicate § 15-810(c)(3).

[7] If the General Assembly had substituted "any" for "all," as CareFirst suggests would be necessary to support the Skippers' interpretation, the statute would seemingly mandate coverage for IVF procedures without regard to deductibles and co-pays. Doing so would be inconsistent with the mandate in § 15-810(c)(3) to treat IVF procedures the same as other pregnancy-related procedures.

100% of certain expenses associated with IVF procedures, as it claims the right to do here, it would be treating those expenses differently from other pregnancy-related expenses, in violation of § 15-810(c)(3).

Although we do not find the IVF coverage mandate in § 15-810(c) to be ambiguous, our review of legislative history confirms our interpretation. *See State v. Roshchin*, 446 Md. 128, 140 (2016) ("But even when the language is unambiguous, it is useful to review legislative history of the statute to confirm that interpretation[.]"). As originally introduced, House Bill 1660 mandated that insurers "shall include" coverage for expenses arising from IVF procedures. *See* Committee Report, H.B. 1660, 393rd Gen. Assemb., Reg. Sess. at 2 (1985) (on file at the Thurgood Marshall Maryland State Law Library). A Committee Report commenting on an amendment to change "shall include" to the current "may not exclude" language observed that "[t]he effect of either language choice is to mandate the coverage."[8] *Id.* Statements submitted in support of and in opposition to the legislation reflect the understanding that its effect would be, as identified in a statement submitted by a consultant to a predecessor to CareFirst, to "mandate benefits for in[ ]vitro

---

[8] Materials in the legislative record suggest that the reason for the change from "shall include" to "may not exclude" was that proponents of the legislation believed IVF procedures should be covered within standard coverage for pregnancy procedures. *See, e.g.*, Committee Report, H.B. 1660, 393rd Gen. Assemb., Reg. Sess. at 2 (1985); Floor Statement, S.B. 793, 393rd Gen. Assemb., Reg. Sess. at 2 (1985). At the time, several insurers provided reimbursement for expenses associated with IVF procedures. Blue Cross and Blue Shield, by contrast, excluded coverage for IVF on the ground that it was still experimental. The language of the statute was adjusted to prohibit the practice that was being targeted—the exclusion of coverage for IVF expenses. *See* Committee Report, H.B. 1660 at 2; Floor Statement, S.B. 793 at 2.

21

fertilization." Zachary Dyckman, Consultant to BlueCross and BlueShield of the National Capital Area, Statement in Opposition to H.B. 1660 and S.B. 793, 393rd Gen. Assemb., Reg. Sess. at 1-2 (1985). The legislative record reflects that it was understood that passage of the bill would mandate that insurers cover IVF-related expenses to the same extent as they cover other pregnancy-related expenses. Nothing in the legislative record suggests that the legislation would permit insurers to pick and choose which medically necessary services arising from IVF procedures they would cover.

CareFirst makes three additional, unpersuasive arguments regarding the plain language of the mandate in § 15-810(c). First, it asserts that the requirement in § 15-810(c)(3)(i) to provide coverage equivalent to other pregnancy-related procedures is merely an "anti-discrimination" provision, requiring that if insurers cover a service associated with naturally conceived pregnancies, they cover the same service for pregnancies conceived through IVF. Thus, CareFirst argues, because the unfreezing of embryos is not covered as part of a naturally conceived pregnancy, it need not be covered here. CareFirst's interpretation would effectively render meaningless the IVF coverage mandate. The statute requires coverage for expenses of IVF procedures "to the same extent" as coverage for other pregnancy-related procedures, not only to the extent that the required services overlap. CareFirst's interpretation is inconsistent with the plain language of the statute and with common sense. *See Westminster Mgmt.*, 486 Md. at 646 (noting that any interpretation of the General Assembly's intent must be reasonable, not one that is "absurd, illogical, or incompatible with common sense").

22

Second, CareFirst argues that the passage of Insurance § 15-810.1 in 2018 indicates the General Assembly's intent to not require coverage for embryo thawing related to IVF under § 15-810. Insurance § 15-810.1 requires insurers to provide coverage for "standard fertility preservation procedures" that are "medically necessary to preserve fertility for a policyholder or subscriber . . . due to a need for medical treatment that may directly or indirectly cause iatrogenic infertility."[9] Ins. § 15-810.1(c). CareFirst emphasizes that the statute defines "standard fertility preservation procedures" to include, in addition to "sperm and oocyte cryopreservation," "treatments associated with sperm and oocyte cryopreservation." *See id.* § 15-810.1(a)(4)(ii). According to CareFirst, "[e]mbryo thawing is plainly within the scope of this definition." Thus, CareFirst contends, if the General Assembly thought coverage for embryo thawing was already required by § 15-810(c), it would not have required coverage for it in § 15-810.1. CareFirst also observes that the Fiscal and Policy Note associated with the bill that enacted § 15-801.1 notes that "CareFirst BlueCross BlueShield indicates that coverage of fertility preservation services is a contract exclusion for its fully insured products." *See* 2018 H.B. 908, Fiscal and Policy Note (3d. rev., Mar. 27, 2018), *available at* https://mgaleg.maryland.gov/2018RS/fnotes/bil_0008/hb0908.pdf, *archived at* https://perma.cc/KZW9-75KJ. According to CareFirst, if the General Assembly saw a

___

[9] Iatrogenic means "induced inadvertently by a physician or surgeon or by medical treatment or diagnostic procedures." *Iatrogenic*, Merriam-Webster's Collegiate Dictionary 614 (11th ed., 2014).

23

problem with its exclusion, it would have amended Insurance § 15-810 at the same time it adopted § 15-810.1.

We fail to see the logic in CareFirst's argument. Simply put, §§ 15-810 and 15-810.1 address different things. The focus of § 15-810.1 is on cryopreservation. To the extent it reaches thawing of preserved sperm and eggs, it does so only as a "treatment[] associated with . . . cryopreservation[.]" Moreover, § 15-810.1 applies regardless of whether the frozen eggs or sperm will ultimately be used in IVF, in some other procedure, or not at all; and it applies only when a person is about to undergo a medical procedure or treatment that may result in their infertility. Section 15-810(c), by contrast, applies only to IVF procedures and only in the case of actual infertility, regardless of how or why it occurs. And the statement in the Fiscal and Policy Note about CareFirst's policies indicates that CareFirst excludes coverage for "fertility preservation services," not the thawing of frozen embryos generally, much less specific to IVF procedures. In short, the General Assembly's adoption of § 15-810.1 sheds no light on whether it believed § 15-810(c) mandates coverage for expenses of IVF-related embryo thawing.

Third, CareFirst argues that embryo thawing does not "aris[e] from [IVF] procedures," because the thawing occurs before the IVF procedure. CareFirst thus suggests that embryo thawing is not a medically necessary component of IVF, but instead is a separate service that merely precedes IVF chronologically. At the motion to dismiss stage, we accept the factual allegations in the complaint as true. *Hancock v. Mayor & City Council of Baltimore*, 480 Md. 588, 603 (2022). The Skippers allege in their complaint

24

that "[t]hawing an embryo is an essential component of most IVF cycles[.]" Giving the Skippers the benefit of appropriate inferences from that allegation, they have sufficiently alleged that the cost of embryo thawing is an expense arising from an IVF procedure.

In sum, except with respect to policies issued to small employers, § 15-810(c) requires insurers to cover expenses arising from IVF procedures to the same extent as expenses arising from other pregnancy-related procedures.

### C. COMAR 31.11.06.06B(11) and Administration Bulletin 13-01

The Skippers purchased the Policy from CareFirst through the Maryland Health Benefit Exchange marketplace, with Mr. Skipper named as the subscriber and Ms. Skipper as a dependent insured spouse. As relevant here, the regulatory framework applicable to the Policy's IVF coverage is provided by the interplay between a regulation applicable to the small employer market and a bulletin issued by the Administration addressing the individual market. *See* Ins. § 2-109(a)(1) ("The Commissioner may adopt regulations to: . . . carry out this [insurance] article[.]"). CareFirst contends that the regulatory framework authorizes it to exclude coverage for IVF-related embryo thawing. The Skippers disagree.

Code of Maryland Regulations ("COMAR") 31.11.06.06 establishes permissible limitations and exclusions applicable to health insurance policies issued to the small employer market. *See* COMAR 31.11.06.01A (identifying the scope of Chapter 31.11.06 as applicable to "all carriers that offer the comprehensive standard health benefit plan to the small employer market"). One of the exclusions permitted by that regulation is for: "In vitro fertilization, ovum transplants and gamete intrafallopian tube transfer, zygote

25

intrafallopian transfer, or cryogenic or other preservation techniques used in these or similar procedures[.]" COMAR 31.11.06.06B(11). Notably, that exclusion does not run afoul of the statutory mandate to cover IVF expenses due to the previously noted exception contained in § 15-810(c)(1) for policies "issued or delivered to a small employer in the State[.]"

Although COMAR 31.11.06.06 does not apply to individual policies issued through the Health Benefit Exchange by its own terms, the Administration uses it as a reference point for its regulation of individual market insurance policies like the Policy. In Administration Bulletin 13-01, the Administration gave guidance on "essential health benefits that will be required" for both individual market and small employer insurance plans. The bulletin instructs that, generally, the same permissible limitations and exclusions apply to both sets of plans, subject to two exceptions. The exception relevant here is for "[t]he exclusion for in vitro fertilization," which the bulletin states "will not be permitted" in individual health plans. The interplay between COMAR 31.11.06.06B(11) and Administration Bulletin 13-01 thus establishes that an exclusion for IVF is permitted in small employer plans but not individual plans.

CareFirst nonetheless contends that COMAR 31.11.06.06B(11) and Bulletin 13-01 permit it to exclude coverage for the thawing of embryos to be implanted through IVF. The path of CareFirst's argument is as follows:

- With respect to individual market policies, Bulletin 13-01 precludes it from excluding coverage only for in vitro fertilization, not any other type of reproductive procedure. Thus, CareFirst may still exclude

26

from individual market policies the other reproductive procedures identified in COMAR 31.11.06.06B(11), which include "ovum transplants and gamete intrafallopian tube transfer, [and] zygote intrafallopian transfer," as well as "cryogenic or other preservation techniques used in these or similar procedures";

- IVF is a "similar procedure[]" to ovum transplants, gamete intrafallopian tube transfers, and zygote intrafallopian transfers;

- Thawing embryos is a "cryogenic . . . technique";

- Therefore, thawing embryos for an IVF procedure is a "cryogenic . . . technique" used in a procedure that is similar to the other procedures listed in COMAR 31.11.06.06B(11), the cost of which is therefore excludable.

In essence, CareFirst would have us give effect to the Bulletin by simply stripping the words "[i]n vitro fertilization" out of COMAR 31.11.06.06B(11), allowing insurers to include the remainder of that exclusion in their individual health plans, and then restricting our consideration of that language only to what remains. Were we to do that, CareFirst's proposed interpretation of that reformulated regulation might have some merit. However, we do not read the text "in isolation but within the context of the statutory [or regulatory] scheme to which it belongs."[10] *Westminster Mgmt.*, 486 Md. at 644. For several reasons, CareFirst's proposed interpretation is not a reasonable one when read in the context of the regulatory scheme and the coverage mandate in Insurance § 15-810(c).

---

[10] "When we construe an agency's rule or regulation, 'the principles governing our interpretation of a statute apply[.]'" *Hranicka v. Chesapeake Surgical, Ltd.*, 443 Md. 289, 298 (2015) (alteration in original) (quoting *Christopher v. Montgomery County Dep't of Health & Human Servs.*, 381 Md. 188, 209 (2004)).

27

First, the interplay between COMAR 31.11.06.06B(11) and Bulletin 13-01 demonstrates an intent to mandate coverage for expenses arising from IVF procedures in individual market policies. The manifest intent of the Administration in providing that "[t]he exclusion for in vitro fertilization . . . will not be permitted" in individual market policies is to preclude insurers from excluding coverage for expenses related to IVF procedures in such policies. If the cost of embryo thawing is a medically necessary expense of IVF, CareFirst's interpretation would give only partial effect to that exception, as some expenses related to IVF procedures could be permissibly excluded.

Second, CareFirst's proposed interpretation relies on removing the words "[i]n vitro fertilization" from COMAR 31.11.06.06B(11) but then reading IVF right back into the exclusion as a "similar procedure[]" to those in which associated "cryogenic . . . techniques" can be excluded. But Bulletin 13-01 does not include a caveat to its directive that the IVF exclusion "shall not be permitted" in individual health plans that would allow such a partial exclusion. It is far more reasonable to interpret the language in Bulletin 13-01 as disallowing any complete exclusion related to IVF in individual health plans than to perform a contorted reinsertion of IVF into the exclusion related only to embryo thawing.

Third, Insurance § 15-810(c) mandates coverage for expenses arising out of IVF procedures, excepting from that requirement only plans issued to small employers. If the cost of embryo thawing is a medically necessary expense arising from IVF procedures, then there is a statutory mandate to cover that expense, and a regulation providing otherwise would be ineffective. *See Baltimore City Dep't of Soc. Servs. v. Hayward*, 426

28

Md. 638, 658 (2012) (noting that "[a]dministrative agencies have broad authority to promulgate regulations, to be sure, but the exercise of that authority, granted by the Legislature, must be consistent, and not in conflict, with the statute the regulations are intended to implement[,]" and collecting cases to highlight that "[w]e have consistently held that the statute must control"). Where there is a reasonable interpretation of the interplay between Bulletin 13-01 and COMAR 31.11.06.06B(11) that does not conflict with § 15-810(c), we will not interpret the regulation in a manner that would place it in conflict with the statute.

In sum, through the interplay between COMAR 31.11.06.06B(11) and Administration Bulletin 13-01, the exclusion of coverage for expenses arising from IVF procedures that is permitted in policies issued to small employers is not permitted in policies issued to individuals. The regulatory scheme does not exempt IVF-related embryo thawing from that result.

### D. The Skippers' Insurance Policy

Having identified the applicable regulatory context, we return to the Policy. In drafting its list of exclusions, CareFirst did what it asks us to do in interpreting the regulatory scheme, which is to remove the words "[i]n vitro fertilization" from the language of COMAR 31.11.06.06B(11) and apply the remainder of that provision as though IVF were never part of it.

The Policy covers "Benefits for Medically Necessary, non-Experimental/Investigational . . . in-vitro fertilization," but it contains the following

29

exclusion that mimics COMAR 31.11.06.06B(11), but for the omission of the words "[i]n vitro fertilization":

> 16.11 Ovum transplants and gamete intra-fallopian tube transfer, zygote intra-fallopian transfer, or cryogenic or other preservation techniques used in these or similar procedures.

CareFirst asserts that, pursuant to this exclusion, it permissibly excludes expenses for the thawing of embryos for IVF procedures based on the similarity of those procedures to the others listed. The Skippers contend that we should interpret this language consistently with the regulatory scheme so as to not permit the exclusion of any medically necessary expenses arising out of IVF procedures.

We assess those contentions through the lens of our contract interpretation principles, including that: (1) we interpret contract language "based on what a reasonable person in the position of the parties would have understood [it] to mean," *Tapestry*, 482 Md. at 239; (2) we can reasonably infer that statutory or regulatory language inserted in a contract is intended to have the same meaning as it has in the statute or regulation, *DeHaan*, 393 Md. at 194; and (3) "applicable or relevant laws must be read into the agreement of the parties . . . except where a contrary intention is evident," *Wright*, 297 Md. at 153.

With the benefit of statutory and regulatory context, it is apparent that the language of Exclusion 16.11 originated in the requirements of Insurance § 15-810(c), COMAR 31.11.06.06B(11), and Bulletin 13-01. Section 15-810(c) mandates coverage for expenses arising from IVF procedures, excepting from that mandate only policies issued to the small employer market. Pursuant to that exception, COMAR 31.11.06.06B(11) allows insurers

30

to exclude coverage for expenses arising from IVF, among other procedures, from plans issued to small employers. And (presumably) because the statutory exception does not apply to policies issued on the individual market, Bulletin 13-01 bars the exclusion of such expenses in those policies, though only as to IVF.

Indeed, the language of Exclusion 16.11 is taken directly from COMAR 31.11.06.06B(11), amended in light of Bulletin 13-01. Accordingly, consistent with our interpretation of the applicable statutory and regulatory scheme and our principles of contract interpretation, we interpret Exclusion 16.11 to not apply to any medically necessary expenses of IVF procedures. Whether CareFirst properly disclaimed coverage for the Skippers' embryo thawing thus turns on whether that procedure was a medically necessary component of the IVF procedure, not on whether IVF is similar to the other procedures listed in COMAR 31.11.06.06B(11).[11]

For these reasons, we agree with the Appellate Court that the circuit court's dismissal of the Skippers' complaint cannot be affirmed on the alternative ground that the Skippers failed to state a claim on which relief can be granted. Accordingly, we will remand this case to that court with instructions to reverse the circuit court's judgment and remand the case to the circuit court for further proceedings consistent with this opinion.

---

[11] Although we agree with the Appellate Court's reversal of the circuit court's judgment and remand for further proceedings, for the reasons stated, we do not agree that the circuit court on remand should determine whether IVF is similar to the procedures listed in Exclusion 16.11. Because Exclusion 16.11 does not apply to any expenses associated with IVF procedures, the similarity of IVF to those other procedures is not relevant to the determination of coverage.

## CONCLUSION

First, we hold that the circuit court erred in dismissing the Skippers' complaint for lack of standing. A class action defendant's tender of individual relief to a putative class representative does not moot a class action lawsuit before the representative has a reasonable opportunity to seek class certification. *Frazier v. Castle Ford, LTD.*, 430 Md. 144, 160-61 (2013). We extend our holding in *Frazier* to the circumstance in which a putative class action is initially filed in another court, dismissed in that court for lack of jurisdiction, and promptly refiled in substantially the same form in state court.

Second, we hold that the circuit court's dismissal cannot be affirmed on the alternative ground that the complaint fails to state a claim on which relief can be granted. Exclusion 16.11 in the Policy does not apply to any medically necessary expenses arising from IVF procedures.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED; CASE REMANDED TO THE APPELLATE COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT AND REMAND TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY PETITIONER.**

IN THE SUPREME COURT

OF MARYLAND

No. 21

September Term, 2025

_____

CAREFIRST BLUECHOICE, INC.

v.

MATTHEW SKIPPER, ET AL.

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Dissenting Opinion by Gould, J.,
which Biran, J. joins.

_____

Filed: April 27, 2026

In *Frazier v. Castle Ford, Ltd.*, this Court held "that a tender of individual relief to the putative class representative does not moot a class action if the individual plaintiff has not had a reasonable opportunity to seek class certification, including any necessary discovery." 430 Md. 144, 160-61 (2013) (footnote omitted). There, the defendant's tender of relief was made *after* the class action complaint was filed in the circuit court. Today, the Majority extends that holding to tenders made before the circuit court action is filed, so long as that tender is made after a substantially similar complaint filed in a different court was dismissed for lack of jurisdiction. Maj. Op. at 32. Thus, the Majority holds, "'a tender of individual relief to the putative class representative' made while the other case was pending in the other court 'does not moot a class action if the individual plaintiff has not had a reasonable opportunity to seek class certification, including any necessary discovery.'" Maj. Op. at 14 (quoting *Frazier*, 430 Md. at 161).

Although *Frazier*'s application of Maryland Rule 2-231 is fully supported by that rule's plain language, the same cannot be said of the Majority's analysis here. What the Majority characterizes as an extension of *Frazier* is, in substance, an amendment to Rule 2-231—one that should be accomplished, if at all, through the rulemaking process, not through an opinion that resolves one case.[1]

---

[1] The Majority defines "promptly refiled in substantially the same form in state court[,]" Maj. Op. at 14, by incorporating the time provided under Maryland Rule 2-101(b), which, as the Majority explains, "treats actions refiled in a court of this state as timely for statute of limitations purposes if they are refiled within 30 days after dismissal on certain grounds by a United States District Court or court of another state." *Id.* at 14 n.5. As explained in Part II *below*, the history behind Rule 2-101(b) is instructive and counsels against making such a substantial policy decision outside of the rulemaking process.

Under the applicable rules, an action cannot be certified as a class action unless it is viable—i.e., not moot—when it is filed in the circuit court. Here, the Skippers' claims were moot when they were filed in the circuit court and legally, it makes no difference that they were rendered moot during the pendency of a federal class action lawsuit. Thus, because I would not reach the merits, I respectfully dissent.[2]

I

A

"An issue is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy that the court can provide." *Frazier*, 430 Md. at 162-63 (citing *Att'y Gen. v. Anne Arundel Cnty. Sch. Bus Contractors Ass'n*, 286 Md. 324, 327 (1979)). Although there is no constitutional bar to deciding a moot issue, we ordinarily decline to do so because our courts exist to resolve live disputes, not to render advisory opinions. *Powell v. Maryland Dep't of Health*, 455 Md. 520, 539-40 (2017).

That a plaintiff must be entitled to an effective remedy when its complaint is filed is embedded in the rules that govern pleadings. A complaint "shall contain only such statements of fact as may be necessary to show the pleader's entitlement to relief or ground of defense." Md. Rule 2-303(b). The complaint must also specify the relief sought and articulate a "clear statement of the facts" to support the claim. Md. Rule 2-305. And when

---

[2] I have considered but am not persuaded by the Skippers' argument that their claims were viable when filed because they still had an unresolved claim for prejudgment interest. Thus, although I agree with the Majority's compelling analysis of the applicable statutes and regulations on the merits, I am constrained to dissent.

the damages sought do not exceed $75,000, the complaint must include the specific "amount of damages sought[.]" *Id.*

Class actions are governed by Rule 2-231. By its plain language, that rule presupposes "an action" by the named plaintiff that satisfies the pleading requirements just discussed. Md. Rule 2-231(c). Subsection (c) provides that "an action may be maintained as a class action" if certain prerequisites are met. Subsection (d) directs that "the court shall determine by order as soon as practicable after commencement of the action whether it is to be maintained as a class action." And subsection (b) permits an action to be certified only if, among other things, "the claims of the representative parties are typical of the claims of the class[.]" Rule 2-231 is thus predicated on the existence of an action that is viable at the time the complaint is filed. Only then may that action be certified as a class action.

The definitions of "action" and "court"—both of which are used repeatedly in Rule 2-231—provide further support. "Action" is defined as "collectively all the steps by which a party seeks to enforce any right in a court or all the steps of a criminal prosecution." Md. Rule 1-202(a). "Court" is defined as "a court of this State and refers, as applicable under the circumstances, to the court (1) to which the title, chapter, or rule applies or (2) in which the particular action or proceeding has been filed or properly could be filed." Md. Rule 1-202(i). And because Title 2 applies "to civil matters in the circuit courts," *see* Md. Rule 1-101(b), "court," as used in Rule 2-231, means the circuit court. In sum, therefore, Rule 2-231 applies to actions filed in the circuit court in conformance with the pleading rules.

B

Which brings us to *Frazier*. There, a car buyer filed a class action complaint alleging that the dealer misrepresented the duration of an extended automobile warranty. *Frazier*, 430 Md. at 148-49. After the complaint was filed, the defendant sought to make the plaintiff whole by extending the warranty and reimbursing the plaintiff's out-of-pocket repair expenses. *Id.* at 150. The defendant then argued that this tender of relief mooted the plaintiff's individual claim and the putative class action. *See id.* at 150-51.

The issue before this Court was whether the dealer's tender of individual relief to the purchaser "precluded certification of this action as a class action with [the purchaser] as the representative plaintiff." *Id.* at 156. We observed that Rule 2-231 requires a circuit court to determine whether to certify the case as a class action "as soon as practicable after commencement of the action." *Id*. at 148. Then, after surveying how federal courts addressed the same issue under Rule 23 of the Federal Rules, we held that "a tender of individual relief to the putative class representative does not moot a class action if the individual plaintiff has not had a reasonable opportunity to seek class certification, including any necessary discovery." *Id*. at 161 (footnote omitted).

*Frazier* was a straightforward defense of a circuit court's obligation under Rule 2-231(d) to "determine" "as soon as practicable after commencement of the action whether it is to be maintained as a class action[.]" In rejecting a tactic designed to nullify that duty before the plaintiff had time to invoke it, we did not suggest that the "action" to be considered for certification could be one that was previously filed and dismissed for lack of jurisdiction in another court. *See Frazier*, 430 Md. at 148. Nor did we suggest that the

4

"action" could be initiated in the circuit court without complying with the applicable pleading rules that require the plaintiff to allege facts supporting its entitlement to judicial relief and to specify the relief sought. *Id.* Rather, the Court's analysis in *Frazier* stayed well within text of Rule 2-231 and the definitions supplied by Rule 1-202 of the words used therein.

C

By extending *Frazier* to a situation in which the alleged "pick off" occurred before the complaint was filed in the circuit court, the Majority accommodates a circumstance not contemplated by *Frazier*: A plaintiff with no live claim at the time the complaint is filed may nevertheless be appointed under Rule 2-231 to serve as a class representative in a class action. To reach this holding, the Majority ventures beyond the text of the rules discussed above by treating the circuit court action as a mere "continuation" of the dismissed federal court action. *See* Maj. Op. at 13.

Thus, under the Majority's extension of *Frazier*, "action," as used in Rule 2-231, is not limited to a circuit court action, as required by Rules 1-202(a) and (i) and 1-101(b), but now includes a prior, federal court action that was dismissed for lack of subject matter jurisdiction. Likewise, "court," as used in Rule 2-231, is not limited to the circuit court, as required by Rules 1-202(i) and 1-101(b), but now extends to a federal court. The phrase "commencement of the action," as used in Rule 2-231(d), no longer refers only to the commencement of a circuit court action, but relates back to the commencement of an ill-fated federal court action. And finally, a plaintiff whose complaint does not allege its entitlement to judicial relief, as required by Rules 2-303 and 2-305, can nevertheless serve

5

as a class representative in a class action. The Majority's extension of *Frazier* cannot be reconciled with the Maryland Rules.

D

The Majority relies not on the text of the governing rules, but instead on the rationale articulated in *Frazier*, where we explained:

> If we accept the facts as alleged in the complaint, the automobile dealer made no effort to rectify the situation until the class action complaint was filed, but then immediately took action to moot it by tendering individual damages to the plaintiff shortly after the complaint was filed and before the plaintiff had any reasonable opportunity to seek class certification or to conduct discovery addressed to the merits of class certification. If all a defendant need do to defeat a class action is to satisfy the class representative's claim immediately after suit is filed, many *meritorious class actions will never get off the ground*. It will be particularly tempting to "pick off" a putative class representative in cases where the underlying conduct affected many people but each claim, including the class representative's, is small or moderate in size—a type of case for which the class action procedure was devised.

430 Md. at 157-58 (citation modified).

The Majority concludes that "the circumstances here give rise to the precise concern animating our decision in *Frazier*." Maj. Op. at 13. Those circumstances are: (1) "CareFirst reversed its coverage decision 23 days after the Skippers filed their putative class action in federal court[]"; (2) the Skippers filed their circuit court action just 15 days after the federal court dismissed that action for lack of subject matter jurisdiction; (3) the circuit court "complaint is identical in every material respect to the dismissed federal complaint"; and (4) CareFirst "moved to dismiss the new complaint for, among other reasons, mootness based on its coverage reversal." *Id.*

6

The Majority's reliance on *Frazier*'s rationale is misplaced. Although CareFirst reversed its coverage decision and reimbursed $900 to the Skippers' medical provider 23 days after the Skippers filed their federal court action, CareFirst did not seek to dismiss the federal complaint or strike the class action allegations on that basis. That's not surprising, because the picking off tactic had already been rejected by the same federal court. *See Winston v. Stewart Title & Guaranty Co.*, 920 F. Supp. 2d 631, 636 (D. Md. 2013). Instead, CareFirst moved to dismiss on other grounds, including that the federal court lacked subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"). As a matter of verifiable fact, therefore, CareFirst's coverage reversal and payment of $900 was not designed to moot the Skippers' federal class action complaint.

Moreover, the Skippers' federal action was not "meritorious" at the outset, as the district court agreed with CareFirst and dismissed the case for lack of subject matter jurisdiction under CAFA. *Skipper v. CareFirst BlueChoice, Inc.*, No: 8:21-cv-01022-DLB, 2023 WL 2410858, at *4 (D. Md. Mar. 8, 2023). Therefore, the *Frazier* Court's concern about preventing "meritorious class actions" from "getting off the ground" is not implicated here. *See Frazier*, 430 Md. at 157 (citation modified).[3]

---

[3] Under CAFA, a federal court has subject matter jurisdiction over a class action complaint where, among other requirements, the putative class would include at least 100 people, and the aggregate claims of the class exceed a minimum of $5,000,000. 28 U.S.C. § 1332(d). When CareFirst reversed its coverage decision, the operative complaint was the original complaint, which alleged that there were "at least dozens" of other similarly situated claimants who were denied coverage by CareFirst. When CareFirst reversed its coverage decision, therefore, it did so with reason to believe that several dozen $900 claims would not be sufficient to establish subject matter jurisdiction under CAFA.

In sum, the Majority's emphasis on the fact that CareFirst reversed its coverage decision only 23 days after that federal action was filed is unwarranted. CareFirst did not rely on its coverage reversal to seek dismissal of the only class action pending at that time, nor could it have successfully done so had it tried. And that class action was not meritorious from the start. At most, one could infer that CareFirst sought to resolve the Skippers' individual claims in anticipation that, eventually, they might file a viable class action complaint in circuit court. But that would make CareFirst no different from any other would-be defendant who, instead of waiting to get sued, pays the claim to resolve the matter—a tactic encouraged by Maryland's strong public policy favoring the voluntary resolution of disputes. *See Long v. State*, 371 Md. 72, 84-85 (2002).

II

The Majority's extension of *Frazier* goes beyond the plain language of Rules 2-231 and 1-202(a) and (i) and implicates the public policy favoring the voluntary settlement of disputes. Changes of this magnitude should be considered in the first instance by the Standing Committee of Rules of Practice and Procedure (the "Rules Committee").

In that regard, the genesis of subsection (b) of Rule 2-101 is instructive. This subsection treats an untimely complaint as timely if it was filed within 30 days after an action filed in another court—which would have been timely filed had it been filed in circuit court—was dismissed for one of three specified reasons.[4] The Majority uses this

---

[4] Rule 2-101(b) provides:

Except as otherwise provided by statute, if an action is filed in a United States District Court or a court of another state within the period of

8

subsection to serve as the benchmark for determining whether, under its test for extending *Frazier*, a plaintiff promptly refiled the putative class action in circuit court upon dismissal of the complaint filed in a different court. Maj. Op. at 14 n.5.

This Court adopted subsection (b) of Rule 2-101 after it instructed the Rules Committee to "consider whether the doctrine articulated in Walko Corp. v. Burger Chef, 281 Md. 207 (1977), should be modified by rule." 19:3 MD. REG. 286 (February 7, 1992). The Reporter's Note explained:

> The thrust of Walko is that the running of the limitations period is not tolled by a timely filed but procedurally defective action that is ultimately dismissed.
>
> There is no question that the rule of law represented by Walko and its progeny can produce harsh results, especially in cases where a plaintiff believes in good faith, but erroneously, that another forum has jurisdiction. On the other hand, careless or forum-shopping plaintiffs should not be able to benefit from ta relaxation of the Walko rule, to the prejudice of defendants.
>
> Mindful of these considerations, the Committee has treated the issue as one of definition—i.e., when an action is commenced. Proposed new section (b) of Rules 2-101 and 3-101 provides, first that the action in the other state or federal court must have been filed within the period of limitations prescribed by Maryland law. Second, the action must be dismissed for lack of jurisdiction or because it is barred by the statute of limitations applicable in the foreign court. Under these circumstances, an action filed within 30 days of the foreign court's order of dismissal is treated as timely filed unless the court determines that it fails to meet one of the four conditions in the Rule.

---

limitations prescribed by Maryland law and that court enters an order of dismissal (1) for lack of jurisdiction, (2) because the court declines to exercise jurisdiction, or (3) because the action is barred by the statute of limitations required to be applied by that court, an action filed in a circuit court within 30 days after the entry of the order of dismissal shall be treated as timely filed in this State.

9

*Id*. Ultimately, this Court removed the four conditions proposed by the Rules Committee and adopted the version in effect today. 19:11 MD. REG. 1003 (May 29, 1992).

Thus, our predecessors perceived a potential source of injustice, requested that the Rules Committee explore addressing it through a change in the rules, the Rules Committee came back with a proposed rule change, and this Court weighed the proposal and adopted a modified version of it. That's how the process is designed to work.

Here, however, the Majority effectively incorporates the relation-back principle of Rule 2-101(b) into Rule 2-231 in a way that departs from the plain meaning of the latter and implicates different policy considerations than those underlying statutes of limitations. If such a change is warranted, it should be made through the rulemaking process, where the competing policy considerations—including the impact on settlement incentives—can be fully considered.

For these reasons, I would hold that the plaintiffs' claims were moot when they filed their circuit court action, and that *Frazier* cannot be extended to revive them.

Accordingly, I respectfully dissent. Justice Biran has authorized me to state that he joins this dissent.